# 25-2191-cv

## United States Court of Appeals

### for the

### Second Circuit

LOST LAKE HOLDINGS LLC, a domestic limited liability company, MISHCONOS MAZAH LLC, a domestic limited liability company, RABBI MORDECHAI HALBERSTAM, ROSE HALBERSTAM,

*Plaintiffs-Appellants,*

– v. –

TOWN OF FORESTBURGH, FORESTBURGH ZONING BOARD OF APPEALS, GLENN A. GABBARD, in his personal capacity and in his official capacity as Building Inspector of the Town of Forestburgh, THE FORESTBURGH TOWN BOARD, STEVE BUDOFSKY, in his personal capacity, SUSAN PARKS-LANDIS, in her personal capacity, KAREN ELLSWEIG, in her personal capacity, VINCENT GALLIGAN, in his personal capacity, DANIEL S. HOGUE, in his personal capacity, RICHARD ROBBINS, in his personal capacity and in his official capacity as Chairperson of the Planning Board of the Town of Forestburgh, DENNIS KETCHAM, in his capacity as Town Assessor of the Town of Forestburgh,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

STORZER & ASSOCIATES, P.C.
*Attorneys for Plaintiffs-Appellants*
1025 Connecticut Avenue, NW
Suite 1000
Wasington, DC 20036
(202) 857-9766

CP COUNSEL PRESS    (800) 4-APPEAL • (387891)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Lost Lake Holdings LLC, a domestic limited liability company, by its undersigned counsel, discloses that Lost Lake Holdings LLC, has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ Eric W. Treene
Eric W. Treene

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Mishconos Mazah LLC, a domestic limited liability company, by its undersigned counsel, discloses that Mishconos Mazah LLC, has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ Eric W. Treene
Eric W. Treene

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION........................................................... 1

ISSUES PRESENTED................................................................................ 2

STATEMENT OF THE CASE..................................................................... 3

    A. The Plaintiffs and the Lost Lake Development ..................... 4

    B. Response to LLH's Purchase of the Development ............... 8

    C. LLH's Building Permit Applications and ZBA Appeal...... 10

    D. The Town's Attempts to Target and Stop the Development .............. 12

    E. Retaliatory Actions................................................................ 13

SUMMARY OF THE ARGUMENT ......................................................... 15

STANDARD OF REVIEW ........................................................................ 17

ARGUMENT .............................................................................................. 18

    I. THE DISTRICT COURT ERRED IN APPLYING *WILLIAMSON COUNTY'S* PRUDENTIAL LIMITATIONS TO PLAINTIFFS' AS-APPLIED CLAIMS...................................... 18

        A. The District Court Erred in Applying Prudential Standing Considerations to Plaintiffs' FHA Claims................. 18

            1. The Doctrine of Ripeness Is a Component of the Injury-in-Fact Prong of Constitutional Standing............ 19

            2. The Ripeness Doctrine of *Williamson County* is Prudential in Nature...................................................... 19

            3. Fair Housing Act Claims Are Not Subject to Prudential Limitations on Standing ............................... 20

            4. *Williamson County*'s Prudential Ripeness Doctrine Is Inapplicable to Claims Brought under the FHA .............................................................. 21

        B. Defendants' Motion to Dismiss was Untimely......................... 22

i

II. ASSUMING, ARGUENDO, THAT *WILLIAMSON COUNTY* APPLIES TO THE BUILDING PERMIT DENIALS, THE ZBA DECISION WAS A FINAL DECISION ...................................23

    A. The ZBA's Decision Was Final Because No Modifications Are Being Sought ....................................23

    B. The District Court Erred in Holding that Further Efforts Would Not Be Futile.......................................27

        1. The Town lacks authority to grant variances .................28

        2. The evidence also unquestionably demonstrates that the Town has "dug in its heels" and future applications will be denied ...............................................32

III. PLAINTIFFS SUFFERED IMMEDIATE INJURIES FROM VARIOUS ACTIONS OF THE TOWN APART FROM THE BUILDING PERMIT DENIALS, AND FROM THE DIGNITARY HARM INFLICTED DURING THE ZBA PROCESS...................................................................35

IV. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER PLAINTIFFS' FACIAL CHALLENGES TO THE TOWN BOARD'S ACTIONS ....................................46

V. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' DUE PROCESS CLAIMS..........................................49

    A. Substantive Due Process ........................................49

    B. Procedural Due Process ..........................................50

VI. THE DISTRICT COURT FAILED TO ADDRESS SEVERAL OTHER CLAIMS THAT WERE NOT SUBJECT TO A *WILLIAMSON COUNTY* "RIPENESS" ANALYSIS ..............53

    A. FHA Retaliation Claim. ..........................................53

    B. New York Civil Rights Law §40-c ..........................................55

    C. Prospective Business Advantage Claim ...................................55

    D. Article 78 Claim.......................................................56

CONCLUSION .......................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adrian v. Town of Yorktown*,
210 F. App'x 131 (2d Cir. 2006) ...................................................................51

*Adrian v. Town of Yorktown*,
No. 03 CIV. 6604 (MDF), 2007 WL 1467417 (S.D.N.Y. May 16, 2007) ..........52

*Allen v. Wright*,
468 U.S. 737 (1984) .....................................................................................52

*Anderson Grp., LLC v. City of Saratoga Springs*,
805 F.3d 34 (2d Cir. 2015) ..................................................................... 21, 46

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
88 F.4th 344 (2d Cir. 2023) ..................................................................... 25, 26

*Bennett v. Spear*,
520 U.S. 154 (1997) .....................................................................................20

*Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*,
111 F. Supp. 3d 459 (S.D.N.Y. 2015) ..........................................................52

*BMG Monroe I, LLC v. Vill. of Monroe*,
93 F.4th 595 (2d. Cir. 2024) ..................................................................... *passim*

*BMG Monroe I, LLC v. Vill. of Monroe*,
No. 20 CIV. 1357 (NSR), 2022 WL 1094538 (S.D.N.Y. Apr. 12, 2022) ...........26

*Bowlby v. City of Aberdeen*,
681 F.3d 215 (5th Cir. 2012) ........................................................................51

*Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*,
344 F.3d 822 (9th Cir. 2003) ........................................................................54

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ............................................................................. 45, 52, 54

*Cedar Dev. E., LLC v. Town Bd. of Hurley*,
No. 1:21CV289MADTWD, 2022 WL 2643571 (N.D.N.Y. July 8, 2022)..........35

*Charette v. Town of Oyster Bay*,
159 F.3d 749 (2d Cir. 1998) ........................................................................48

iii

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*,
116 F.4th 161 (2d Cir. 2024) ............................................................47

*Cine SK8, Inc. v. Town of Henrietta*,
507 F.3d 778 (2d Cir. 2007) .............................................................49

*Cnty. Concrete Corp. v. Town of Roxbury*,
442 F.3d 159 (3d Cir. 2006) ....................................................... 48, 50

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
915 F. Supp. 2d 574 (S.D.N.Y. 2013) ..............................................48

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
945 F.3d 83 (2d Cir. 2019) ..................................................... 45, 47, 48

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*,
790 F.3d 411 (2d Cir. 2015) .............................................................18

*Curry v. City of Syracuse*,
316 F.3d 324 (2d Cir. 2003) .............................................................25

*Daly v. Eagan*,
77 Misc. 2d 279 (N.Y. Sup. Ct. 1972) ..............................................47

*Dexter v. Town Bd. of Town of Gates*,
324 N.E.2d 870 (N.Y. 1975) ............................................................30

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
282 F.3d 83 (2d Cir. 2002) ............................................. 19, 40, 53, 54

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
316 F.3d 357 (2d Cir. 2003) ....................................................... 20, 21

*Field Day, LLC v. Cty. of Suffolk*,
463 F.3d 167 (2d Cir. 2006) .............................................................47

*Goldfine v. Kelly*,
80 F. Supp. 2d 153 (S.D.N.Y. 2000) .................................................33

*Greens at Chester LLC v. Town of Chester*,
No. 19-CV-6770 (PMH), 2020 WL 2306421 (S.D.N.Y. May 8, 2020) ....... 22, 41

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
406 N.E.2d 445 (N.Y. 1980) ....................................................... 55-56

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ............................................................. 20, 21, 46

iv

*Hyman v. Cornell Univ.*,
834 F. Supp. 2d 77 (N.D.N.Y. 2011) ....................................................55

*Kittay v. Giuliani*,
112 F. Supp. 2d 342 (S.D.N.Y. 2000) ........................................... 49, 50

*Kleinknecht v. Ritter*,
No. 21-2041, 2023 WL 380536 (2d Cir. Jan. 25, 2023) ....................................29

*Kowalczyk v. Barbarite*,
594 F. App'x 690 (2d Cir. 2014) ....................................................51

*Kurtz v. Verizon New York, Inc.*,
758 F.3d 506 (2d Cir. 2014) ....................................................51

*Lamar Advert. of Penn, LLC v. Town of Orchard Park*,
356 F.3d 365 (2d Cir. 2004) ....................................................48

*LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412 (2d Cir. 1995) ............................................ *passim*

*Livant v. Clifton*,
334 F. Supp. 2d 321 (E.D.N.Y. 2004)....................................................47

*Lost Lake Holdings LLC v. Hogue*,
221 N.Y.S.3d 710 (N.Y. App. Div. 3d Dept. 2024)............................................40

*Lost Lake Holdings LLC v. Hogue*,
221 N.Y.S.3d 719 (N.Y. App. Div. 3d Dept. 2024) ........................................... 40

*Lost Lake Holdings LLC v. Town of Forestburgh*,
No. 22 CV 10656 (VB), 2025 WL 1899026 (S.D.N.Y. July 9, 2025)................14

*Lost Lake Holdings LLC v. Town of Forestburgh*,
No. 22 CV 10656 (VB), 2023 WL 8947154 (S.D.N.Y. Dec. 28, 2023) ....... 24, 44

*Lost Lake Resort, Inc. v. Bd. of Assessors for Town of Forestburgh*,
222 A.D.3d 1091 (2023)........................................... 12-13, 37

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........................................... 19, 27

*Lynch v. City of N.Y.*,
952 F.3d 67 (2d Cir. 2020) ....................................................18

*Lynn v. Vill. of Pomona*,
373 F. Supp. 2d 418 (S.D.N.Y. 2005)....................................................46

*MacDonald v. Safir*,
  206 F.3d 183 (2d Cir. 2000) ...................................................................48

*Mazzocchi v. Windsor Owners Corp.*,
  No. 11 CIV. 7913(AT), 2013 WL 5295089 (S.D.N.Y. Sept. 17, 2013) .............53

*McCulloch v. Town of Milan*,
  No. 07 CV 9780 LAP, 2008 WL 2986257 (S.D.N.Y. July 17, 2008) .................21

*Murphy v. New Milford Zoning Commission*,
  402 F.3d 342 (2d Cir. 2005) ............................................................ 23, 27, 28, 51

*N.Y. Civil Liberties Union v. Grandeau*,
  528 F.3d 122 (2d Cir. 2008) ...................................................................19

*Nasierowski Bros. Inv. Co. v. City of Sterling Heights*,
  949 F.2d 890 (6th Cir. 1991) ............................................................ 51, 52

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ............................................................ 18, 19

*Olsen v. Stark Homes, Inc.*,
  759 F.3d 140 (2d Cir. 2014) ...................................................................20

*Pakdel v. City & Cnty. of San Francisco*,
  594 U.S. 474 (2021) ...................................................................26

*Pearson v. City of Grand Blanc*,
  961 F.2d 1211 (6th Cir. 1992) ...................................................................50

*Purdy v. Zeldes*,
  337 F.3d 253 (2d Cir. 2003) .....................................................................1

*Pyke v. Cuomo*,
  258 F.3d 107 (2d Cir. 2001) ...................................................................47

*RC Enters. v. Town of Patterson*,
  840 N.Y.S.2d 116 (2007) ...................................................................49

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,
  294 F.3d 35 (2d Cir. 2002) ...................................................................53

*Sherman v. Town of Chester*,
  752 F.3d 554 (2d Cir. 2014) ............................................................ 19, 22, 34

*Smithfield Concerned Citizens v. Town of Smithfield*,
  907 F.2d 239 (1st Cir. 1990) ...................................................................50

*Southview Assocs., Ltd. v. Bongartz*,
  980 F.2d 84 (2d Cir. 1992) ............................................................... 27-28

*St. Onge v. Donovan*,
  71 N.Y.2d 507, 522 N.E.2d 1019 (1988) ..........................................30

*Suitum v. Tahoe Reg'l Planning Agency*,
  520 U.S. 725 (1997) ............................................................. 19, 27, 47

*Sunrise Detox V, LLC v. City of White Plains*,
  769 F.3d 118 (2d Cir. 2014) ................................................. 36, 41, 45

*Sunrise Dev., Inc. v. Town of Huntington, New York*,
  62 F. Supp. 2d 762 (E.D.N.Y. 1999)..................................................40

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ...........................................................................19

*Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco*,
  No. 02 CIV. 444 (LTS), 2003 WL 21219794 (S.D.N.Y. May 21, 2003)............25

*Town of Bethel v. Howard*,
  198 F.3d 235 (2d Cir. 1999) ...............................................................33

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972) ...........................................................................20

*Vill. Green At Sayville, LLC v. Town of Islip*,
  43 F.4th 287 (2d Cir. 2022) ......................................................... 24, 45

*W.J.F. Realty Corp. v. Town of Southampton*,
  351 F. Supp. 2d 18 (E.D.N.Y. 2004)..................................................25

*Weinrib v. Weisler*,
  307 N.Y.S.2d 603 (N.Y. App. Div. 2d Dept. 1970)............................31

*Westchester Day Sch. v. Vill. of Mamaroneck*,
  417 F. Supp. 2d 477 (S.D.N.Y. 2006) ...............................................56

*Williamson County Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*,
  473 U.S. 172 (1985) ................................................................... *passim*

*Winston v. City of Syracuse*,
  887 F.3d 553 (2d Cir. 2018) ...............................................................49

*Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*,
  98 F. Supp. 2d 347 (S.D.N.Y. 2000)..................................................55

vii

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1343 ....................................................................................1

28 U.S.C. § 1367 ................................................................................1, 56

28 U.S.C. § 2201 ....................................................................................1

28 U.S.C. § 2202 ....................................................................................1

42 U.S.C. § 1982 ....................................................................................1

42 U.S.C. § 1983 ....................................................................................1

42 U.S.C. § 3602(i) ...............................................................................20

42 U.S.C. § 3613 ...............................................................................1, 20

42 U.S.C. § 3617 ..................................................................................53

FED. R. CIV. P. 12 .......................................................................... *passim*

N.Y. C.P.L.R. § 217 ..............................................................................56

N.Y. C.P.L.R. § 7801 ............................................................................56

N.Y. C.P.L.R. § 7803 ............................................................................56

N.Y. Civil Rights Law § 40-c (McKinney) ..........................................55

N.Y. PUB. OFF. LAW § 84 (McKinney)...................................................40

N.Y. TOWN LAW § 267 (McKinney)................................................. 28, 56

TOWN OF FORESTBURGH, N.Y. CODE § 180 ..................................... 28, 29

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this action below pursuant to 28 U.S.C. §§ 1331, 1343(3), (4), 2201, and 2202; 42 U.S.C. §§ 3613(a), *et seq.*; and 42 U.S.C. §§ 1982 and 1983, which confer original jurisdiction in suits to redress the deprivation of rights, privileges, and immunities secured by the laws and Constitution of the United States. The District Court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over claims arising under New York law.

On July 9, 2025, the District Court issued a memorandum opinion (SPA-1-25) granting Defendants-Appellees' motion to dismiss most of the Counts of the First Amended Complaint. SPA-25. Thereafter, on August 22, 2025, the District Court entered an order and judgment that disposed of Plaintiffs' claims and dismissed the action.[1] SPA-26; SPA-27.

On September 9, 2025, the Plaintiffs timely filed their Notice of Appeal of the District Court's Judgment (JA-1669). This Court's jurisdiction is conferred over the final order and dismissal pursuant to 28 U.S.C. § 1291.

---

[1] The court did not dismiss three constitutional and state law claims relating to a search of the Plaintiffs' property in November 2022. It entered a stipulation and order of voluntary dismissal on August 21, 2025, providing that these claims were dismissed without prejudice, but may be refiled only if the Court of Appeals reverses the DistRict Court's dismissal of one or more of the other claims. JA-34. *See Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003).

1

## ISSUES PRESENTED

1. Do prudential ripeness considerations apply to the claims brought under the Fair Housing Act?

2. Was Defendants' motion to dismiss on prudential ripeness grounds untimely?

3. Did the District Court err in holding that the Zoning Board of Appeals' affirmance of the denial of Plaintiffs' building permits was not a final decision?

4. Would seeking a variance have been futile, where Defendants lacked discretion to grant variances or amendments, and where Defendants have made clear through their intentional, extensive, and concerted efforts to prevent Hasidic Jews from moving to the Town that they have "dug in their heels"?

5. Did the District Court err in dismissing on prudential ripeness grounds independent actions of the Defendants that were separate from the building permit denials but also caused Plaintiffs injury?

6. Did the District Court err in dismissing on prudential ripeness grounds Plaintiffs' facial challenges to legislative acts of Defendants, which are ripe upon adoption?

7. Did the District Court err in dismissing on prudential ripeness grounds Plaintiffs' Due Process claims?

8.    Did the District Court err in dismissing Plaintiffs' retaliation claims, which are immediately ripe?

9.    Did the District Court err in dismissing Plaintiffs' pendent state law claims as unripe?

## STATEMENT OF THE CASE

This case involves the concerted, systematic, and sustained efforts of the Town of Forestburgh, New York and certain of its officials to prevent Hasidic Jews from moving to the Town based on anti-Hasidic Jewish animus. As the Town Board's agent with respect to Plaintiffs' development, Defendant Planning Board Chair Richard Robbins, stated shortly before his appointment, "Please don't be scared about the hasidic threat — we're energized and have the cash to fight and make their lives miserable. . . ." JA-1558.

When Plaintiffs purchased the development that is the subject of this action, former Comprehensive Plan Review Committee member Justin Evans wrote to several defendants asking them to "circle the wagons" (JA-1570), saying of Hasidic Jews that "they take over, like locusts – killing everything they encounter, draining every last resource, bleeding the beast . . . and destroying Forestburgh as we know and love it today." *Id*. Responsive to local residents' and their own prejudice, Defendants have complied, targeting Hasidic Jews in action after action, with the Town Board ultimately issuing a formal resolution that "suspended all Town issued

3

permits and approvals" and required Plaintiffs–who had acquired an already-approved residential development–to restart the process because of their belief that the "demographics" for the development had shifted to "Hasidic Jewish families . . . ." As Plaintiffs alleged in their Complaint, and as is supported by considerable evidence, Town officials, prominent residents, and two private clubs (the Hartwood and Merriewold Clubs) developed a joint strategy resulting ultimately in the Town's hostile actions against the Hasidic Jewish community.

This is an appeal of the order of the U.S. District Court for the Southern District of New York, Hon. Vincent Briccetti, Judge, of July 9, 2025, dismissing this case on grounds of prudential ripeness, and the final judgment based thereon filed August 22, 2025.

A. The Plaintiffs and the Lost Lake Development.

Plaintiffs Lost Lake Holdings LLC and Mishconos Mazah LLC are real estate development companies (collectively, "LLH") whose principals are Hasidic Orthodox Jews. JA-36 ¶ 2; JA-363 ¶¶ 1, 5-7; Dkt. 95 ¶¶ 4-6.[2] In 2020, LLH purchased a shovel-ready, mixed-use, residential subdivision in the Town of Forestburgh, New York (the "Town") known as the Lost Lake Resort (the "Development"). JA-36 ¶ 4; JA-364 ¶¶ 8, 10, JA-369 ¶ 40. The previous owner,

---

[2] Parts of the record not contained in the Joint Appendix are annotated by their Docket ("Dkt.") number.

4

Double Diamond Resorts, Inc, obtained Planned Development District ("PDD") rezoning approval for the seven-phase Development in 2011.  JA-48 ¶ 62; JA-364 ¶ 11; JA-401-406.   The Town enthusiastically supported Double Diamond's Development.  JA-155; JA-158-159; JA-162-165; JA-222 ¶ 32; Dkt. 99-24 at 2-3; Dkt. 100 ¶ 17, JA-365 ¶ 17; JA-364 ¶ 16, JA-386-388.  Significantly, there were no "mitigation measures" included in the Findings Statement under the New York State Environmental Quality Review Act, N.Y. ENV'T CONSERV. LAW §§ 8-0101-8-0117 ("SEQRA"), or conditions of approval in the PDD rezoning (which adopted any specified mitigation measures as conditions) that restricted the Development in terms of who would *build* the homes, who was allowed to *live* in them, or whether they could be *seasonal* or *full-time* homes (JA-854-901; JA-909-912), pretextual issues that Defendants would later use as points of objection to the Development requiring reapplication.  The individual plaintiffs are Rabbi Mordechai Halberstam, a principal of Plaintiff Mazah, and his wife Rose.  The Halberstams wish to purchase homes in the Development and live in Forestburgh.  JA-110 ¶ 498.

The first phase of the Development, which included 400 single-family lots and a nine-hole golf course, also received final subdivision and site plan approval in 2013 (JA-49-50 ¶¶ 69-71; JA-401-406; JA-407-414), and only needed the issuance of ministerial, non-discretionary building permits for single family homes to be built. JA-50 ¶ 76; JA-365-366 ¶¶ 21-22.

5

Fears that the Development could draw Hasidic Jewish home buyers began manifesting early in the Town. JA-51-58 ¶¶ 84-120; JA-398; JA-417; JA-802. Town officials agreed with these sentiments. JA-802; JA-174. As early as 2011, Defendant Robbins sought to assure others that "the amenities provided . . . are not the kinds of things that Hasidic developments ever include."[3] JA-1521 ¶ 5; JA-1530.

In 2016, the newly elected Town Board appointed Robbins as Planning Board Chair, and member of the newly created Comprehensive Plan Review Committee. JA-52-53 ¶¶ 92-93; JA-478-479; JA-493-494. Significantly, Robbins played a key role in the Town's later efforts targeting the Plaintiffs. JA-67-77 ¶¶ 185-270; JA-356. He was designated by the Town Supervisor as the "point person" to discuss the Development, and Plaintiffs were told to speak with him directly. JA-140-141 ¶¶ 6-7; JA-142; JA-366 ¶ 26; *see also* JA-1522 ¶ 6, JA-1532.

Several months prior to Robbins' appointment as Planning Board Chair, Robbins reassured a Hartwood Club member: "Please don't be scared about the hasidic threat - we're energized and have the cash to fight and make their lives miserable . . . why would they want to go to a community that is going to fight them

---

[3] Robbins stated that a certain property would not be appealing to a Hasidic Jewish buyer, because "there's no opportunity for creating a neighborhood of people similar to them. Do you think they have any interest in fishing? or Hunting? Or being among people who include anti-semites [sic]." JA-1522 ¶ 7, JA-1538. *See also* JA-1522 ¶ 9, JA-1554.

6

tooth and nail?" JA-1522 ¶ 10, JA-1556-1558.[4]

In August 2016, Justin Evans,[5] then a member of the Town's Comprehensive Plan Review Committee (JA-493-494), sent an email to the Town Supervisor, the Planning Board Chair, the Zoning Board of Appeals ("ZBA") Chair, and other Town officials, expressing his fear about a Hasidic "Religious group" and "religious voting block" and warning that, as a result, "[t]he community is wrecked forever. Please don't let this happen." JA-53 ¶¶ 94-95; JA-197. He discussed his "Hartwood friends" (*id.*), which refers to the Hartwood Club, one of two clubs (with the Merriewold Club) in the Town that have worked with the Town to target Plaintiffs and prevent Hasidic Jews from obtaining housing. *See generally infra*, JA-62-63 ¶¶ 151-152, JA-91 ¶ 359, JA-102-103 ¶¶ 435, 445-49, JA-108-109 ¶¶ 483-89; JA-458-459; JA-707-717.

Double Diamond ultimately decided to sell the Development. JA-55-56 ¶¶ 114-16.

---

[4] There has been very limited discovery in this case. Most of the email communications referenced in this brief came into Plaintiffs' possession as a result of a small test sample from a few individuals for Electronically Stored Information agreed upon with Defendants' former counsel. Shortly after Defendants sent the test emails to Plaintiffs, Defendants hired new counsel and moved to stay discovery. There has been no additional discovery.

[5] Evans, who is also a board member of the Hartwood Club (JA-367 ¶ 29; JA-499; *see infra*), also played a key role in working with the Town to keep out "a religious voting block community." JA-53 ¶¶ 94-95; JA-197; JA-512-513; JA-356.

B. Response to LLH's Purchase of the Development.

In July 2020, Plaintiffs purchased the Development and the project Site, acquiring all rights to the Site, development rights, approvals, and constructed infrastructure. JA-56 ¶ 116; JA-368 ¶¶ 35-36. Once the religious identity of the principals became known, the outpouring of antisemitic hostility was immediate, resulting in comments such as "you wonder why Germans did what they say they did." JA-57 ¶ 117(c); *see also* JA-56-58 ¶¶ 117-20; JA-207-209; JA-213-216. In August 2020, Defendant Hogue, the Town's Supervisor, assured his constituents that: "There will be much more oversight than Lost Lake had." JA-58-59 ¶ 125; JA-361. On October 20, 2020, Justin Evans wrote to Defendants Robbins, Budofsky, Hogue, and Gabbard, repeating timeworn but still appalling canards:

> I would strongly encourage you to immediately gather the major leaders and stakeholders in town to discuss this clear threat and the potential defenses the town can employ. Speaking only for Hartwood, we have some fairly sophisticated legal and engineering resources within our membership and as hired advisors. . . . I hope you'll ask for help and circle the wagons. . . .
>
> . . . .
>
> . . . . I do fear their wanton destruction of the towns and school districts . . . they take over, like locusts - killing everything they encounter, draining every last resource, bleeding the beast . . . , and destroying Forestburgh as we know and love it today.

JA-1522-1523 ¶ 13, JA-1570 (emphasis added). Defendant Steven Budofsky wrote to Evans after meeting about Lost Lake two weeks later: "Just know that your

8

concerns are my concerns and I will advocate for any measures that protect our town." JA-1523 ¶ 14, JA-1572 (emphasis added). Robbins forwarded Evans' email to unknown recipient(s), presumably a Merriewold member, stating:

> I'm forwarding this email that was sent by Justin Evans . . . .
>
> While I too have been thinking strategy about how to prevent Lost Lake from overwhelming the town and it's [sic] rural character, and believe we all need to consider carefully how this is to be done, and that the money to pay for the expertise to guide that effort may need to be raised outside the town's budgetary structure, . . . .
>
> . . . . I'm in kind of a tricky spot as a town official with direct responsibility over the review and approval of site plans and compliance of those to Forestburgh zoning code and approved master plan requirements.
>
> As an outsider now to Merriewold governance (a necessity to not having an ethical bar to continuing to be able to participate in review of Lost Lake matters on behalf of the town) I leave it to you and our board as to how best to preserve our special community from potential impacts wrought by our neighbors.

JA-1522-1523 ¶ 13, JA-1569 (emphases added). Evans further urged the Town Board to retain special outside counsel, comments echoed by Robbins (JA-60-62 ¶¶ 134-45; JA-356), which the Town then did. *See infra.*

Robbins initially urged Merriewold's Board to abstain from opposing the Development to avoid disqualifying him "given [his] role as the Town Board's agent in assuring [Lost Lake's] compliance with the restrictions imposed, and as Planning Board Chairman." JA-1523 ¶¶ 18-19, JA-1582, JA-1584. He nonetheless still became heavily involved with the Clubs' efforts to oppose the Development. JA-

9

1522-1524 ¶¶ 6, 20-22, JA-1532-1536, JA-1586, JA-1591, JA-1593-1594 (Robbins coordinated a "small group of experienced Merriewolders" for "the Lost Lake effort and related coordination with Hartwood."). This coordination extended to the law firm Harris Beach, hired by the Town, and the CEO of which is "a life-long Merriewolder . . . ." JA-1524 ¶ 22, JA-1593; JA-1524 ¶ 23, JA-1597.

C. LLH's Building Permit Applications and ZBA Appeal.

On November 17, 2020, LLH obtained a building permit for a single-family home and began construction. JA-60 ¶¶ 132-33; JA-369-370 ¶¶ 45, 47; JA-528-529; JA-535. After that first permit, however, the Town's treatment changed with respect to successive applications, even though there was no material difference between them. JA-67 ¶¶ 185-90; Dkt. 83 at 12. Intense scrutiny was imposed on Plaintiffs, orchestrated not by the Town's Building Inspector, but by special litigation attorney Javid Afzali and Robbins. JA-67-69 ¶¶ 190-205; Dkt. 83 at 12; JA-148 ¶¶ 11-12; JA-231 70:6-10; JA-1524 ¶ 24, JA-1601. The Town improperly delayed action on the permits, arbitrarily imposed incorrect requirements, and enumerated meritless deficiencies. JA-67-77 ¶¶ 185-272; Dkt. 83 at 12-14; JA-218 ¶ 9; JA-234-245; Dkt. 84-6 at 2-10.

On November 23, 2021, Defendant Gabbard formally denied a subsequent building permit application. JA-76 ¶ 263; JA-537-538. The only specific reason

10

stated for the denial was that "instead of" the project previously approved, "'reasonably priced and affordable [housing] units'" would be offered to Hasidic Jewish families. JA-76 ¶ 264, JA-537. The Building Inspector denied Plaintiffs' next applications for identical reasons. JA-594-635; JA-637.

Plaintiffs appealed the denials to the ZBA (JA-261-303), which held hearings rife with procedural and substantive irregularities. JA-85-94 ¶¶ 314-77; *see infra*, Argument § III (listing examples).

Without discussion, on November 15, 2022, the ZBA met for twenty minutes to deny the appeal and adopt Afzali's written resolution. JA-93-94 ¶¶ 370-76; JA-705; JA-819-820 at 2:24-3:2, JA-823 at 6:18-20, JA-827-858 at 10:2-11:12; JA-149-150 ¶¶ 1-6, 9-10; JA-152 at 11:38-12:50; JA-1385. The ZBA's reasons were explicitly discriminatory:

> While LLH's intent to expand the <u>demographics</u> of the Resort Project can be reasonably inferred from LLH's amendments to the 2013 CC&R and 2013 Design Guidelines [sic], representations by its counsel confirm the change (R. 24 [LLH counsel stating 'be advised that my clients will be offering reasonably priced and affordable units <u>to Hasidic Jewish families</u> who have a very significant unmet demand for such units']."

JA-1377 (alteration in original, emphases added); JA-1354-1355, JA-1365-1366. The ZBA also stated an additional pretextual justification, inconsistency with so-called "2013 Design Guidelines."[6] JA-94-97 ¶¶ 382-401.

---

[6] In fact, no "2013 Design Guidelines" ever existed; only a *draft* version was created in

Plaintiffs have always intended to build the Development according to all requirements, terms, restrictions and conditions contained in the Development's zoning, subdivision and site plan approval, as the Town was aware. JA-76-77 ¶¶ 267-68; JA-377 ¶ 95; JA-361 (Supervisor Hogue stating that Plaintiffs "plan on building it as it was approved"); JA-221 ¶ 29 (Plaintiffs' counsel confirming to Afzali that Plaintiffs would not seek to modify Phase 1).

D. The Town's Attempts to Target and Stop the Development.

The Town also undertook several other actions seeking to block the development and prevent Orthodox Jews from moving to Forestburgh. At its July 2, 2021 meeting, and prompted by Robbins, the Town increased its per-lot Parks & Playground fee 1000%, from $200 to $2,000, increasing Project costs of later phases by approximately $3,882,000. JA-64 ¶¶ 158-66; JA-352; JA-369 ¶¶ 43-44. It also illegally over-assessed the Development's properties. *See infra*, Argument § III; JA-79-84 ¶¶ 281-310, JA-107-109 ¶¶ 471-89; JA-645; JA-660-664; JA-247-251; JA-810-816; *Lost Lake Resort, Inc. v. Bd. of Assessors for Town of Forestburgh*, 222

---

2010 that was never adopted; they did not exist until 2021. JA-97 ¶¶ 399-400; JA-372 ¶¶ 58-59, JA-378 ¶¶ 99-100. Further, it was Plaintiffs' express reserved right to amend these Guidelines under the approval obtained from the Town. JA-47 ¶¶ 54-55, JA-94-97 ¶¶ 382-401; JA-541; JA-1372. This reservation of rights was reprinted in the Final Environmental Impact Statement ("FEIS"), and no specific set of design guidelines were ever imposed as approval conditions or mitigation measures. *Id.*, JA-575-578, JA-1055, JA-849-850 §§ 3.11, JA-854 § 6; JA-908-911, JA-914 ¶ 6.

A.D.3d 1091 (2023).

E. Retaliatory Actions.

LLH filed this action on December 16, 2022. In response, and directly responsive to the Hartwood Club's requests, Defendants took several additional actions to prevent *any* development, including construction of necessary infrastructure. JA-101-106 ¶¶ 433-67; JA-376 ¶¶ 89-90; Dkt. 100-60 at 4-9. These include:

1. Issuing a set of violations and Stop Work Order on February 1, 2023 to "immediately cease all construction activities" on the Property, including infrastructure work (JA-102-103 ¶¶ 439-43; JA-742-744), and claiming that the Development was now "unapproved." JA-742.

2. The Town Board's Resolution 2023-02 (February 2, 2023), which attempted what the Hartwood Club demanded: Mandating that Plaintiffs restart the process under SEQRA for the Development, suspending all permits and approvals, and prohibiting further development. JA-103-105 ¶¶ 445-57; JA-758, JA-762-765, JA-772.

3. The Town Board's authorization of litigation against LLH to enjoin any and all infrastructure construction. JA-103 ¶ 445; JA-772.

4. The Town Board's February 9, 2023 notice to third party agencies to

13

prevent approvals from being issued.  JA 105 ¶ 457; JA-767.

5.    The Town Board's March 30, 2023 Resolution, which required Plaintiffs to restart the lengthy and expensive SEQRA review process. JA-106 ¶¶ 463-67; JA-786-788.

These actions completely prevent Plaintiffs from developing the Development in accordance with its existing zoning and site and subdivision approvals.  JA-39 ¶ 10.

Plaintiffs amended their complaint on April 24, 2023, adding a claim of retaliation under the Fair Housing Act for these actions, and adding the individual Plaintiffs.  Plaintiffs moved for a preliminary injunction on June 1, 2023, which the District Court denied on December 28, 2023, but also found the Plaintiffs' claims to be ripe.

The parties initiated discovery.  After minimal discovery, Defendants moved in January 2025 under Federal Rules of Civil Procedure 12(b)(1) and 12(c) to dismiss most claims as unripe.

On this second motion, the District Court dismissed not only Plaintiffs' claims regarding the ZBA's decision, but also facial and as-applied claims brought by the Plaintiffs with respect to the Town's other actions including the Town's adopted Resolutions suspending all approvals and prohibiting any further development. *Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22 CV 10656 (VB), 2025 WL 1899026 (S.D.N.Y. July 9, 2025).  The District Court also dismissed nearly all other

14

claims, including claims that are not subject to the same ripeness analysis and claims that were not addressed in the court's opinion.

This appeal followed.

**SUMMARY OF THE ARGUMENT**

This appeal involves a federal civil rights action seeking to stop the coordinated, deliberate and animus-based effort of Forestburgh and its officials, in concert with various local community leaders and entities, to stop "the hasidic threat" (JA-1558) who are claimed to "take over, like locusts – killing everything they encounter" (JA-1569-1570), through a pattern of massive resistance on multiple fronts to Plaintiffs' efforts to build homes in the Town. The District Court dismissed Plaintiffs' various claims—which range from as-applied challenges to the ZBA's affirmance of the building permit denials and multiple other actions taken by Defendants, to facial challenges to the Town's legislative actions, to retaliation claims under the FHA and state law—based on the "prudential ripeness" doctrine of *Williamson County Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), *overruled in part by Knick v. Twp. of Scott,* 588 U.S. 180 (2019). This was in error and should be reversed, for multiple reasons.

First, prudential ripeness does not apply to FHA claims at all. This Court and the Supreme Court have made clear that standing under the FHA may only be limited by Article III, and not prudential concerns. Since this Court's precedents further

15

make clear that ripeness is simply an element of the "injury in fact" standing inquiry, a claim under the FHA need only meet the requirements of Article III to be ripe for adjudication. Moreover, as a non-jurisdictional motion to dismiss, Defendants' motion to dismiss for prudential ripeness was untimely.

Second, even if prudential ripeness applied to Plaintiffs' FHA challenges to the building permit denials, they are final decisions. Plaintiffs seek to build homes in accordance with the approvals granted. Unlike this Court's *BMG* decision on which the District Court relied, Plaintiffs do not seek to depart from the prior approvals. *BMG Monroe I, LLC v. Vill. of Monroe*, 93 F.4th 595, 603 (2d. Cir. 2024) ("*BMG*"). Defendants' contention that the demographics of the target market of "Hasidic Jewish families" is different and that this marks a material change is irrelevant to legitimate zoning criteria under state law.

Third, the final decision requirement does not apply to injuries independent of the challenged land-use decision, such as passing and repealing ordinances, over-assessing Plaintiffs' properties, and issuing stop-work orders. Moreover, the dignitary harm caused by Defendants to the individual plaintiffs is also a separate independent injury causing immediate harm.

Fourth, seeking a variance or amendment here would in any case be futile, both because (a) neither the ZBA nor the Town Board can legally grant the relief suggested by the District Court, and (b) the extensive anti-Semitism displayed by

16

Town officials and resulting actions make it abundantly clear that they have "dug in their heels" (SPA-13) and–in their own words–are committed to "fight them tooth and nail" (JA-1558) and allowing the development is something they "would never let [] happen." JA-1556.

Fifth, the District Court dismissed the Plaintiffs' facial challenges to certain resolutions and ordinances, which are ripe immediately on adoption.

Sixth, Plaintiffs' due process claims were dismissed in error. The Defendants' actions were based on animus and thus bore no rational relationship to a legitimate government interest, violating Plaintiffs' substantive due process rights. Defendants' building permit and ZBA appeal processes were rife with irregularities and religious and racial bias, and thereby caused an injury independent of the outcome.

Finally, the District Court dismissed—without discussion—other claims that were not dependent upon a final land use decision, including Plaintiffs' retaliation claims and Plaintiffs' claims under New York law.

## STANDARD OF REVIEW

In considering a motion under Rule 12(b)(1), "[t]he plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue. In assessing the plaintiff's assertion of standing, we accept as true all material allegations of the complaint and construe the complaint in favor of the complaining

17

party. In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (cleaned up). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up).

This Court "review[s] *de novo* a District Court's determination that it lacks subject-matter jurisdiction on ripeness grounds." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013).

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN APPLYING *WILLIAMSON COUNTY'S* PRUDENTIAL LIMITATIONS TO PLAINTIFFS' AS-APPLIED CLAIMS.

#### A. The District Court Erred in Applying Prudential Standing Considerations to Plaintiffs' FHA Claims.

The prudential ripeness concerns of *Williamson County*, relied upon by the District Court, do not apply to Plaintiffs' FHA claims. "Ripeness" itself is, as the Court has held, part of the injury aspect of Article III standing. However, the ripeness concerns of *Williamson County* are prudential in nature, and not jurisdictional, and the Supreme Court has held that courts cannot create prudential barriers to standing in FHA suits.

18

1. *The Doctrine of Ripeness Is a Component of the Injury-in-Fact Prong of Constitutional Standing.*

Ripeness is "a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage*, 714 F.3d at 688; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, n.5 (2014). This Court has compellingly explained this relationship:

> Constitutional ripeness . . . is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury . . . is not 'actual or imminent,' but instead 'conjectural or hypothetical.'"

*Nat'l Org. for Marriage,* 714 F.3d at 688; *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (same); *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008) (the existence of a case or controversy is sufficient to establish both standing and constitutional ripeness).

2. *The Ripeness Doctrine of Williamson County is Prudential in Nature.*

Similarly, both the Supreme Court and this Court have recognized that "'*Williamson County* is a prudential rather than a jurisdictional rule, . . . .'" *Sherman v. Town of Chester,* 752 F.3d 554, 561 (2d Cir. 2014) (citation omitted); *see also Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733-34 (1997) (stating that both *Williamson County* prongs are prudential); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1011-12 (1992) (same).

19

3. *Fair Housing Act Claims Are Not Subject to Prudential Limitations on Standing.*

Equally established is the principle that claims brought under the FHA are not subject to prudential standing limits. Prudential standing is a "judicially self-imposed limit[] on the exercise of federal jurisdiction," *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citation omitted), which, in contrast to Article III standing, Congress can alter and relax. *Id.* Accordingly, federal courts have long held that Congress intended the FHA's standing to "extend to the full limits of Art[icle] III and that the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (citation omitted); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington,* 316 F.3d 357, 362 (2d Cir. 2003) ("there are no prudential limits on standing under the FHA." (citing *Havens Realty*)); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014).

The FHA's text broadly defines who can assert claims under the statute; specifically, who qualifies as an "aggrieved person." *See* 42 U.S.C. §§ 3613(a)(1)(A), 3602(i); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *Olsen*, 759 F.3d at 158. In *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 424-25 (2d Cir. 1995), a case also involving allegations of religious discrimination against Orthodox Jews in violation of the FHA, this Court discussed the relevance of "aggrieved person" to the standing inquiry. *Id.* at 425. This Court reversed the

20

district court's holding that no FHA injury existed because there was no application yet, focusing on the FHA's definition of "aggrieved person," and particularly that it includes someone who "believes" he "*will* be injured by a discriminatory housing practice that is about to occur." *Id.* at 424 (emphasis in original). It thus found that the Village's adoption of a code, with its discriminatory intent and an expectedly biased interpretation, was precisely the kind of "about to occur" violation that, under the FHA, opens the courthouse door. *Id.* at 425. *See also Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44-45 (2d Cir. 2015); *Fair Housing in Huntington Committee Inc. v. Town of Huntington*, 316 F.3d 357, 362 (2d Cir. 2003).

4. *Williamson County's Prudential Ripeness Doctrine Is Inapplicable to Claims Brought under the FHA.*

Because (a) ripeness is a component of standing, specifically related to whether an injury in fact exists, (b) *Williamson County* ripeness is prudential, rather than jurisdictional in nature, and (c) FHA claims are not subject to prudential limitations on standing, the Plaintiffs' FHA claims are not subject to *Williamson County*.[7] *See McCulloch v. Town of Milan,* No. 07 CV 9780 LAP, 2008 WL 2986257, at *1 (S.D.N.Y. July 17, 2008) (rejecting defendants' ripeness challenge, and holding under *Havens Realty* that "a plaintiff need only meet the 'Article III

---

[7] While *BMG* included dismissal of FHA claims, the panel did not address the resulting conflict with this Court's prior precedents in *LeBlanc-Sternberg* or the other cases discussed above.

21

minima of injury in fact' in order to have standing to pursue an FHA claim."); *Greens at Chester LLC v. Town of Chester*, No. 19-CV-6770 (PMH), 2020 WL 2306421, at *4 (S.D.N.Y. May 8, 2020) (rejecting county argument that "claims are not ripe, as the County never made a final decision or took any final agency action regarding the Plaintiff's property" because "standing under the FHA is broad").

B. Defendants' Motion to Dismiss was Untimely

Motions brought under Rule 12(b)(1) "must be made before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b). Defendants' Answer was filed on January 29, 2024. Dkt. 124. Motions brought under Rule 12(c) must be brought "early enough not to delay trial . . . ." FED. R. CIV. P. 12(c). The District Court granted a stay of discovery pending resolution of their Motion to Dismiss (Dkt. 172), which unquestionably would have delayed a trial.

While the District Court stated that "[u]nder Rule 12(g)(2) and (h)(3), the Court may consider a motion to dismiss for lack of subject-matter jurisdiction at any time" (JA-1519), prudential ripeness does *not* implicate subject matter jurisdiction, as described above. *See also Sherman*, 752 F.3d at 561 ("*Williamson County* is a prudential rather than a jurisdictional rule" (citation omitted)); *BMG,* 93 F.4th at 600 ("*Williamson County*'s prudential-ripeness doctrine 'is not, strictly speaking, jurisdictional'" (citations omitted)). Rules 12(g)(2) and (h)(3) are therefore inapplicable, and the motion to dismiss should have been denied as untimely.

22

## II. ASSUMING, ARGUENDO, THAT *WILLIAMSON COUNTY* APPLIES TO THE BUILDING PERMIT DENIALS, THE ZBA DECISION WAS A FINAL DECISION.

### A. The ZBA's Decision Was Final Because No Modifications Are Being Sought.

The District Court's reliance on *BMG* to dismiss Plaintiffs' claims related to the building permit denial was in error. Plaintiffs did not seek "modifications" to the Final Site Plan Approval conditions or any other adopted zoning law or condition necessitating further review–as was the case in *BMG*–given that Plaintiffs intend to build the homes as permitted, with the only difference being that the Town expects that Hasidic Jews may live in such residences. The District Court simply accepted the Defendants' position that "plaintiffs' building permits were found to be non-compliant with existing approvals" (SPA-18). But Plaintiffs challenge that very determination as both erroneous and discriminatory.

Unlike in *Murphy v. New Milford Zoning Commission*, 402 F.3d 342 (2d Cir. 2005), Plaintiffs followed the appropriate building permit application and appeal process to obtain a final decision. After many hearings, the ZBA denied Plaintiffs' appeal in a lengthy opinion, determining that their plan to "offer[] reasonably priced and affordable units to Hasidic Jewish families" was inconsistent with the PDD. JA-94-100 ¶¶ 378-425. This was a "conclusive determination" from the ZBA that Plaintiffs may not "develop the subdivision in the manner [they] proposed."

23

*Williamson County*, 473 U.S. at 193. Plaintiffs have submitted "at least one meaningful application to the relevant municipal entity," *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 296 (2d Cir. 2022). As the District Court below held in its first consideration of ripeness in its prior decision,

> [T]he parties have clearly staked out their positions. Accordingly, for plaintiffs to seek a variance, return to the Town Board, or apply for project modifications at this stage would be a useless and perfunctory exercise that would not aid the Court in adjudicating their claims.

*Lost Lake Holdings LLC v. Town of Forestburgh*, No. 22 CV 10656 (VB), 2023 WL 8947154, at *5 (S.D.N.Y. Dec. 28, 2023). *BMG* did not alter this analysis. There were no "abstract disagreement[s]," *Sayville*, 43 F.4th at 293 (citation omitted); the ZBA rendered a "final decision" on the application, "prevent[ing] them from building sorely needed homes" and causing "significant financial damages" including "lost profits and asset value" and "loss of home sales," thus inflicting a concrete injury. JA-112-114 ¶¶ 517-26. Nothing in *BMG* changed this analysis.

The purpose of the ripeness doctrine is "to avoid entangling [the Court] in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Vill. Green at Sayville*, 43 F.4th at 293 (citation omitted). There is nothing speculative about the ZBA's decision that Plaintiffs cannot build. The ZBA decided that, "[b]ased on the above record, LLH's target market, as evidenced in the record, is materially different that [sic] Double Diamond's 'upscale high-end resort development' . . . ." JA-100 ¶ 421; JA-1356.

24

This is sufficient to demonstrate prudential ripeness. *See, e.g., Town & Country Adult Living, Inc. v. Vill./Town of Mount Kisco*, No. 02 CIV. 444 (LTS), 2003 WL 21219794, at *2 (S.D.N.Y. May 21, 2003) (FHA claims ripe because "the Zoning Board denied the application on its merits.").

Moreover, unlike in *BMG*, the Plaintiffs here do not seek to depart from the prior approvals. *BMG* was an application of the principles of *Williamson County*, *Murphy* and their progeny, and did not change the underlying legal landscape. In *BMG*, the Court held that the prior decision was not final because the landowner's building applications "departed from the proposed layout and architectural designs attached to the SEQRA Findings," and it was therefore "required to seek a second variance from the Village's zoning restrictions before proceeding to federal court." 93 F.4th at 603. Plaintiffs' Amended Complaint included allegations (supported by evidence) and an Article 78 claim brought under New York law (*see infra*, § VI(D)) that "the building permit applications do in fact comply . . . ." JA-97 ¶ 401; *see also* JA-96-97 ¶ 396; JA-94-101 ¶¶ 380-432 (detailed allegations explaining the same); JA-372 ¶¶ 58-59, JA-377-378 ¶¶ 95, 99-100; JA-221 ¶ 29; JA-361.[8]

---

[8] To the extent that the Town disagreed with Plaintiffs' allegations, this created a question of material fact central to the Town's argument and therefore not appropriately resolved on a motion to dismiss. *See, e.g., W.J.F. Realty Corp. v. Town of Southampton*, 351 F. Supp. 2d 18, 24 (E.D.N.Y. 2004) (declining to grant summary judgment on *Williamson County* finality grounds because the "conflicting positions raise genuine issues of material facts." (citing *Curry v. City of Syracuse*, 316 F.3d 324, 329 (2d Cir. 2003)).

As in *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344 (2d Cir. 2023), the ZBA's decision "amount[s] at a minimum to *de facto* finality, which is all that is required, . . . ." *Id.* at 351-52 (citing *Pakdel v. City & Cnty. of San Francisco,* 594 U.S. 474, 480 (2021)). In *Pakdel,* the Supreme Court rejected an expansive reading of *Williamson County*: "The finality requirement is relatively modest. All a plaintiff must show is that 'there [is] no question . . . about how the 'regulations at issue apply to the particular land in question.'" *Id.* at 478 (citation omitted). Here, the Defendants have taken a clear position that the PDD zoning does not permit Plaintiffs' use.

Unlike *BMG,* the ZBA's decision has an immediate effect on Plaintiffs. Because of the ZBA's discriminatory understanding of the "demographics" of individuals that may live in the homes, its decision prohibits Plaintiffs from building *any* homes in the Development. In *BMG*, the company was able to–and in fact did–continue building compliant homes. *BMG Monroe I, LLC v. Vill. of Monroe*, No. 20 CIV. 1357 (NSR), 2022 WL 1094538, at *6 (S.D.N.Y. Apr. 12, 2022), *aff'd*, 93 F.4th 595.

*BMG* arose from a backdrop of a state court decision that held that the applicable zoning of the property included specific conditions and mitigation measures that were unquestionably part of its approval. *Id*. at *3, *4. To build contrary to those approvals, this Court held that the plaintiff must first seek a

26

variance. *BMG,* 93 F.4th at 603. There is no analog here. The marketing vision discussed by Double Diamond–not incorporated as either conditions or mitigation measures–does not come close to the actual conditions at issue in *BMG.*

The District Court failed to identify any such imposed conditions with which Plaintiffs' building permit applications were not in compliance. Rather, it relied on the Town's vague arguments such as "[t]he DEIS and FEIS relied on representations" about prospective residents (Dkt. 163 at 9). Such documents cannot "rely" on anything–conditions are either imposed or they are not. The Defendants claimed that "[t]he [Findings Statement] specifically states, 'Individual single-family residences will be constructed by individual lot purchasers.' ECF 110-5 at 7" (Dkt. 163 at 10), but no such statement existed in the actual cited PDD Approval, nor does the Findings Statement contain such a mitigation measure or condition. The ZBA's decision to the contrary is final.

B. <u>The District Court Erred in Holding that Further Efforts Would Not Be Futile.</u>

Plaintiffs also succeed under this Court's "futility" doctrine, given that the Town both lacks authority to grant variances and has dug in its heels and made clear that it is committed to preventing Hasidic Jews from moving to the Town. *See Suitum,* 520 U.S. at 739 (holding that the land use board had no discretion over how a landowner could use her property such that "no occasion exists for applying *Williamson County*'s [finality] requirement"); *Lucas v. South Carolina Coastal*

27

*Council,* 505 U.S. 1003, 1012 n.3 (1992) (stating that an application for a variance is not required when it would be "pointless"); *Murphy*, 402 F.3d at 349; *Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 98-99 (2d Cir. 1992) (discussing futility exception); *BMG*, 93 F.4th at 601.

### 1.     *The Town lacks authority to grant variances.*

The District Court held that Plaintiffs must seek relief "in the form of a variance application to the Town Board" before their claims became ripe (SPA-18), even though Plaintiffs do not seek to build any prohibited use that would require a variance.  Nevertheless, *BMG* did not change this Court's holding that "a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances." *Murphy*, 402 F.3d at 349.  Only the ZBA is authorized to grant a variance–*see* N.Y. TOWN LAW § 267-b (McKinney); TOWN OF FORESTBURGH, N.Y. CODE § 180-3 (eCode360 2023, available at https://ecode360.com/44643693) (definition of "variance"); *id.* § 180-38(A) (SPA-35)–but the ZBA admitted that "because the terms, restrictions and conditions incorporated into the PDD have the force and effect of law, no one other than the municipal corporation . . . may modify or amend" them.  JA-1379.  Any such application to the ZBA would therefore be futile.

So too with respect to an application to the Town Board.  Plaintiffs cannot amend their PDD approval to remove conditions (even if there were conditions to

28

remove). The PDD law under which the approval was obtained has since been repealed, and now the approval cannot be amended in a manner that eliminates conditions or restrictions, as the (now non-conforming) Development "remains valid and subject to the repealed PDD local laws, <u>but only to the extent</u>" that it "complies with . . . all Project approval terms, conditions, and restrictions discussed above," which the ZBA made explicit in its denial (later adopted by the Town Board). JA-1383 (emphasis added).[9]

Defendants Town and Robbins, in issuing the Planning Board's formal report required with any change to the zoning code,[10] made this clear when the local law repealing the PDD law was reviewed:

> This repeal <u>prevents a modification of the existing PDD</u> and will be directly affected.

Dkt. 117-25 at 3 (emphasis added). Further, the purpose of the Town's repeal of the PDD law itself was specifically to target Hasidic Jews by prohibiting such amendments. *See* JA-54 ¶ 106.

---

[9] The District Court appeared to conflate "variances" (which only the ZBA may grant) with amendments to the PDD approval (which the Town Board could have granted prior to the repeal of the PDD law). SPA-20 n.3. Assuming the court was referring to the latter, it merely accepted the Defendant ZBA's contention that an amendment was available, without reference to the very next passage (quoted above) that the Development is only allowed as a non-conforming use, therefore requiring compliance with all approval terms, conditions and restrictions. JA-1383.

[10] TOWN OF FORESTBURGH, N.Y. CODE § 180-45(A) (eCode360 2023, available at https://ecode360.com/44645216) ("Planning Board report").

Accordingly, any application would be futile. *See Kleinknecht v. Ritter*, No. 21-2041, 2023 WL 380536, at *3 (2d Cir. Jan. 25, 2023).

Perhaps most significantly, even if the PDD law had not been repealed, the Town cannot legally grant the specific relief that Defendants allege is necessary to address the purported change in circumstances.

First, with respect to the ZBA decision's justification that there would be a change in the "demographics" to permit "Hasidic Jewish families" (JA-1377; JA-1354-1355, JA-1365-1366), requiring Plaintiffs to specifically request a variance or amendment to allow Hasidic Jewish families would be an obvious violation of, *inter alia*, Plaintiffs' Equal Protection and FHA rights.

Second, the Defendants also claim that the issue of *who* builds the homes is controlled by the PDD approval, and that the developer building homes itself as opposed to individual purchasers building homes "was not authorized under the Project Approvals."[11] Dkt. 163 at 5. Not only is this claim false as no such condition actually exists, but the Town Board has no authority to limit who may develop and use the property under New York law. *See Dexter v. Town Bd. of Town of Gates*, 324 N.E.2d 870, 871-72 (N.Y. 1975) (stating "fundamental rule that zoning deals basically with land use and not with the person who owns or occupies it."); *St. Onge*

---

[11] There was in fact no such actual mitigation measure or condition of approval. JA-985-1019; JA-1020-1026.

30

*v. Donovan*, 71 N.Y.2d 507, 517, 522 N.E.2d 1019, 1023 (1988) (holding that variance that "purports to terminate the variance automatically if any persons other than the original applicants use the property as a real estate office" was an improper "personal condition"). This applies to building permits as well. *Weinrib v. Weisler*, 307 N.Y.S.2d 603, 604 (N.Y. App. Div. 2d Dept. 1970), *aff'd,* 261 N.E.2d 406 (N.Y. 1970) (holding that prohibition on assignments of building permits was unconstitutional, since it attempted "to control the ownership and transference of property, rather than its use."). Zoning authorities cannot condition approval on *who* will receive a building permit.

Third, the Town had also argued that more homes would be used as full-time residences (and therefore would have greater environmental impacts), compared to 57% using them as second homes under Double Diamond's estimation. *See* Dkt. 163 at 4. However, even if this was a mitigation measure or condition of approval– which it was not–there is absolutely no evidence supporting this contention. To the contrary, the *only* evidence was Plaintiffs' testimony before the ZBA and declarations submitted in this case, which show that Plaintiffs' expected second home market demand is far *greater* than 57%. JA-1477-1478 ¶¶ 76-82; Dkt. 99-18 at 40:9-41:3; Dkt. 119 ¶¶ 9-17. Again, there is nothing to "apply" for.

Finally, the ZBA's pretextual justification that the building permit applications were not in compliance with the so-called 2013 draft "Design

31

Guidelines" and Declaration of Covenants and Restrictions,[12] no longer appears to be the focus of the Town's arguments or the District Court's decision. *See* Dkt. 163; Dkt. 183; SPA-17. Regardless, such issue no longer exists at all because, as Plaintiffs informed the District Court prior to its dismissal of their claims, LLH reverted any changes made to the Design Guidelines and CC&R's. Since February 25, 2025 (JA-1653-1665), they have fully aligned with the original draft Design Guidelines and CC&R's at the time of the PDD approval. JA-540-549; JA–553-592. There is simply no amendment Plaintiffs can seek to satisfy Defendants' purported concern over design issues since the guidelines are the same as they originally were.

Thus, it would be futile to seek a variance or amendment for changes that either (a) do not exist; or (b) the Town or ZBA lack legal authority to grant.

2. *The evidence also unquestionably demonstrates that the Town has "dug in its heels" and future applications will be denied.*

If there ever was a case where a jurisdiction has "dug in its heels," this is it. We know what the Town's position is because they have said so. Fear of the Hasidic

---

[12] Plaintiffs alleged that not only were the building applications consistent with the specified provisions of the draft Design Guidelines and Declaration of Covenants and Restrictions in the Town's SEQRA Findings Statement (JA-96-97 ¶¶ 392, 401), these documents permitted amendments to the same, which the Findings Statement recognized. JA-96-97 ¶¶ 394-97; JA-849. Moreover, the specific terms of these documents were never imposed as a "mitigation measure" or a condition of approval in the Lost Lake PDD. JA-94-96 ¶¶ 384-91.

32

Jewish community coming to Forestburgh is long-standing, and has led to an organized strategy involving the Town, prominent Town residents, and Town Clubs working together to ensure that:

> If they were to try to change the zoning they'd fail. And part of why they'd fail is that the elected representatives - not to mention the appointed ones - would never let that happen. Especially if right minded ones vote for those committed to protecting the town from this kind of degradation.

JA-1522 ¶ 10, JA-1556 (emphases added). This statement by Robbins came to fruition through the Town's various actions taken against Plaintiffs and Hasidic Jews generally.

Defendants have acted to prevent "[t]he community" from, in their view, being "wrecked forever." JA-197. As Robbins stated, the Town "is going to fight them tooth and nail" (JA-1558) and they "all need to consider carefully how this is to be done, . . . ." JA-1522 ¶ 13, JA-1569. He also urged, shortly before becoming Planning Board Chair, "[p]lease don't be scared about the hasidic threat–we're energized and have the cash to fight and make their lives miserable." JA-1558. *Compare Goldfine v. Kelly*, 80 F. Supp. 2d 153, 160 (S.D.N.Y. 2000) ("The courts also have considered the defendant's hostility, delay and obstruction in application of the futility exception."); *with Town of Bethel v. Howard*, 198 F.3d 235 at *3 (2d Cir. 1999) (holding that party had not shown futility because "[t]here is no evidence of any Town bias against Howard").

In addition to the ZBA's denial and the discriminatory treatment of Plaintiffs during their building permit application, the Town's "fight" has already manifested in the various roadblocks Defendants imposed to block the development. *See supra*, § III. This treatment is very similar to the "war of attrition" at issue in *Sherman*, 752 F.3d at 563 (describing adoption of new zoning regulations, announcement of a moratorium on development; replacing its officials, requiring plaintiffs to resubmit studies already completed; and requiring Sherman to pay additional fees). Further, most of these efforts come from the Town Board itself, which would decide any future PDD amendment request, if one was even possible. As described above, communications between Town Board members and other Town officials and local residents demonstrate a joint and organized effort between them, with full knowledge of its significance. *See, e.g.*, JA-1522 ¶ 6, JA-1532 (Robbins writing to Merriewold president saying "I don't think it is a good idea for me to put anything about Lost Lake in writing. I am happy to discuss with the [Merriewold] committee.").

Now the Town tells Plaintiffs to just go ahead and apply to the Town Board to change the very zoning[13] for which "they'd fail" and that the Town "would never

---

[13] Plaintiffs would require a zoning amendment (which the Town Board lacks authority to grant, *see supra*) as the Town's Resolution states: "Developer will be required to prepare a supplemental environmental impact statement <u>and obtain approvals for such modifications as required under PDD Local Law § 85-19 (B) (2)</u>, . . . ." JA-772 (emphasis added).

34

let [] happen." *See supra*. This differs sharply from the facts present in *BMG*, where the board merely expressed "doubts" about a variance application, and did not betray antisemitic animus. *BMG*, 93 F.4th at 603-04.

The futility of any application here is not mere "speculation." The Town has made it clear that it is "energized and ha[s] the cash to fight and make their lives miserable." JA-1442. It hired consultants and attorneys specifically to create roadblocks for the Lost Lake development. JA-60-61 ¶¶ 134-37; JA-61-62, ¶¶ 140, 144, 146; JA-356, JA-358; Dkt. No. 100-21. On (presumably metaphorical) "amphetamines" (JA-1558), the Town has used every means at its disposal to obstruct the Development. This is more than sufficient to demonstrate futility. *See Cedar Dev. E., LLC v. Town Bd. of Hurley*, No. 1:21CV289MADTWD, 2022 WL 2643571, at *6 (N.D.N.Y. July 8, 2022) (courts consider "defendants' hostility, delay and obstruction" "in application of the futility exception." (internal citations omitted)).

## III. PLAINTIFFS SUFFERED IMMEDIATE INJURIES FROM VARIOUS ACTIONS OF THE TOWN APART FROM THE BUILDING PERMIT DENIALS, AND FROM THE DIGNITARY HARM INFLICTED DURING THE ZBA PROCESS.

Separate and apart from the final decision of the ZBA, the Plaintiffs suffered immediate and independent injuries from the various discriminatory actions inflicted upon them by the Town. A plaintiff alleging discrimination in the context of a land-use dispute is not subject to the final-decision requirement if "he can show that he

35

suffered some injury independent of the challenged land-use decision." *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 123 (2d Cir. 2014).

> [A] plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face . . . or the manipulation of a zoning process out of discriminatory animus to avoid a final decision, . . . . In those cases, "pursuit of a further administrative decision would do nothing to further define [the] injury," and the "claim should not be subject to the application of the *Williamson* ripeness test." "

*Id.* (citations omitted). Both conditions exist here.

Unlike in *BMG*, the Town has adopted a zoning policy to keep out Hasidic Jews, and has implemented that policy in several different ways. Even with the limited discovery that occurred, the record is rife with such evidence. The "point person" for the Town's regulation of the Lost Lake development, Robbins, stated, *inter alia*:

> A friend sent me the actual "playbook" for how hassids go about identifying where they will next colonize . . . The gist of why I am not worried is that we are too far from the "nest" - in Brooklyn for these busy bees to colonize Forestburgh. . . . Please don't be scared about the [H]asidic threat — we're energized and have the cash to fight and make their lives miserable….. .why would they want to go to a community that is going to fight them tooth and nail. Bloomingberg [sic] was asleep: we're on amphetamines."

JA-1558; *see also supra*, § II(C)(2) (discussing Town's strategy and practices against Hasidic Jews).

Several Town officials (including the Town Supervisor, Deputy Supervisor, Town Clerk, Code Enforcement Officer, and Town Planning Board Chair Robbins)

were advised by former Town Comprehensive Plan Review Committee member Justin Evans "I hope you'll ask for help and circle the wagons" (JA-1570), and warned that the Town must fight the Jewish "locusts" to keep them from "destroying Forestburgh as we know and love it today." JA-1570. Instead of disagreeing with the email, Robbins forwarded it to others, endorsing its sentiment by stating "I too have been thinking strategy about how to prevent Lost Lake from overwhelming the town . . . ." JA-1569.[14]

As alleged in Plaintiffs' Amended Complaint, this hostility has manifested in a number of actions in furtherance of the Town's anti-Hasidic policy, outside of the discriminatory treatment suffered at the hands of the ZBA recounted below. These include:

1. Illegally overassessing the Development site's taxable value. JA-107-108 ¶¶ 471-78; *Lost Lake Resort, Inc.*, 222 A.D.3d 1091.

2. Increasing the development fees ten-fold. JA-64 ¶¶ 158-66, JA-108 ¶ 479; JA-352.

3. Hiring consultants and attorneys for "real litigation advice" specifically for Lost Lake, paid for by Plaintiffs' own escrow. JA-60-62 ¶¶ 134-36, 140, 144, 146; JA-356, Dkt. 100-17 at 2; Dkt. 100-21.

---

[14] As part of this strategy, Defendants have also delayed discovery and reneged on discovery agreements (Dkt. 160), and prevented discovery in their retaliatory state case (JA-1493-1494 ¶¶ 34-37, JA-1612-1618).

4. Robbins' appointment as the "point person" to deal with Lost Lake, and taking authority to review permits away from the Town's Building Inspector and giving it to newly hired counsel. JA-67 ¶¶ 186-87; JA-70 ¶ 214; JA-140-141 ¶¶ 5-7; JA-142-143; JA-1522 ¶ 6, JA-1532-1536; JA-366 ¶ 26.

5. Denying ordinary building permits because "Hasidic Jewish families" would live there. *See supra.*

6. Adopting a new escrow law allowing the Town to charge Lost Lake for such consultants, increasing costs further. JA-82-84, ¶¶ 299, 304-10; JA-644-645.

7. Imposing "much more oversight than Lost Lake had." JA-58-59 ¶ 125; JA-361.

8. Repealing the PDD Law in its entirety. JA-54 ¶ 106; JA-523-526.

9. Adopting moratoria against development, targeting Lost Lake three separate times. JA-54 ¶¶ 103, 105; JA-80-81 ¶¶ 291-96; JA-514-521; JA-810-816.

10. Indemnifying its own officers and employees for acts or omissions during their official duties. JA-63 ¶¶ 155-57.

11. Introducing new ZBA rules during Lost Lake's application. JA-86 ¶ 316.

12. Defendant Hogue illegally entering and searching the Development site. JA-109-110 ¶¶ 490-95.

13. Coordinating with the Hartwood and Merriewold Clubs, whose members and officials have displayed significant antisemitic bias, and adopting their strategy. JA-53 ¶¶ 93-98; JA-486; JA-499; JA-197; JA-55 ¶¶ 112-13; JA-509-513; JA-62-63 ¶¶ 146-54; Dkt. 100-21; JA-90-91 ¶¶ 355-59; Dkt. 100-37 at 2-5; JA-707-728; JA-91 ¶¶ 362-64; JA-101-102 ¶¶ 435-37; JA-103-104 ¶¶ 444-49; JA-756-759, JA-769-773; JA-105 ¶ 457; JA-767-768; JA-108-109 ¶¶ 480-89; JA-1524 ¶ 23; JA-1597; JA-1522 ¶ 13, JA-1569-1570; JA-60-62 ¶¶ 134-45; Dkt. 100-17 at 3; JA-356; Dkt. 100-20; JA-367 ¶ 29; JA-499; JA-808 ¶ 7; JA-1558; JA-1522 ¶ 10; JA-1556; JA-493-494; JA-53 ¶¶ 94-95; JA-707; JA-1522-1524 ¶¶ 6, 20-22; JA-1532; JA-1586; JA-1591; JA-1593-1594; JA-1524 ¶ 22; JA-103-105 ¶¶ 445-57; JA-762-765; JA-770-772.

14. Issuing a baseless stop work order for the first, approved home that was already completed. JA-101 ¶ 434; JA-730.

15. Adopting a resolution authorizing the Town to accept unsolicited donations to fund its legal action against LLH. JA-101-102 ¶¶ 435-37.

16. Issuing another stop work order prohibiting *any* further development and suspending all Town permits and approvals. JA-102-103 ¶¶ 439-43; JA-742-744.

17. Filing the state court action to prevent any further development. JA-104 ¶ 450; Dkt. 100-46.

18. Reopening the SEQRA process and requiring Plaintiffs to re-apply for approvals of the already-approved Development. JA-103 ¶¶ 444-45, JA-770-773; JA-105 ¶ 456-57, JA-767-768; JA-106 ¶ 463, JA-786-795.

19. Violating FOIL, N.Y. PUB. OFF. LAW § 84 (McKinney), as it relates to the Plaintiffs. *See generally Lost Lake Holdings LLC v. Hogue*, 221 N.Y.S.3d 710 (N.Y. App. Div. 3d Dept. 2024); *Lost Lake Holdings LLC v. Hogue*, 221 N.Y.S.3d 719 (N.Y. App. Div. 3d Dept. 2024).

These further actions all present injuries independent of the ZBA denial itself. *See Dougherty*, 282 F.3d at 90 (2d Cir. 2002) ("Dougherty suffered an injury at the moment the defendants revoked his permit, and Dougherty's pursuit of a further administrative decision would do nothing to further define his injury."). In other cases, the Southern District of New York has rejected such ripeness defenses in similar circumstances. *See Sunrise Dev., Inc. v. Town of Huntington, New York*, 62 F. Supp. 2d 762, 770-71 (E.D.N.Y. 1999) ("As to actual, concrete injury, the passage

40

of the new Local Law means that Sunrise will be forced to begin the application process anew to seek a zoning change."); *Greens at Chester LLC v. Town of Chester*, No. 19-CV-6770 (PMH), 2020 WL 2306421, at *4 (S.D.N.Y. May 8, 2020) ("the Proposed Complaint alleges sufficient facts demonstrating the County's conduct in expressing their intentions to the Town to stop the development, followed by specific actions taken, such as contacting the State Department of Health to suggest that the Plaintiff's water be tested, is sufficient conduct for a ripe claim against the County.").

Ultimately, this hostility led to the wholesale termination of the Development by Town Board action, as described above. This case (like *Sunrise Detox*) stands in stark contrast to *BMG*, where the plaintiff was free to continue to build compliant homes. Plaintiffs can no longer build what the PDD zoning allows without suffering significant additional delay and expense, or otherwise face "civil and/or criminal monetary sanctions . . . ." JA-742-744. These are deliberate acts of sabotage, each one a brick in the wall Defendants have erected to completely block Plaintiffs' lawful use of their property in order to prevent Hasidic Jews from building and acquiring homes in Forestburgh.

Second, one "need not await a final decision to challenge . . . the manipulation of a zoning process out of discriminatory animus to avoid a final decision." *Sunrise Detox,* 769 F.3d at 123. Nothing in *BMG* altered this analysis. Here, as Plaintiffs

41

have plausibly alleged and supported with testimony and documentary evidence that the application review and ZBA process itself was permeated with discriminatory animus and procedural irregularities, which include:

1.    Antisemitic comments, emails, and social media posts by Town officials and residents.[15]   JA-51-60 ¶¶ 84-133; JA-206-209; JA-213-216.

2.    Allowing Town officials other than the Building Inspector to review the building permit application.  JA-147-148 ¶¶ 1, 5-12; Dkt. 96-1; JA-218 ¶ 12, JA-254; JA-221 ¶ 25; Dkt. 99-20.

3.    Actions of the Building Inspector such as refusing to grant or deny the building permit (JA-147-148 ¶¶ 1, 10; Dkt. 96-1) but demanding that it just be "pick[ed] up" (JA-147-148 ¶¶ 5-9).

4.    Requiring "conditions" of preliminary site plan approval, when final site plan approval had already been granted.  JA-148 ¶ 10; Dkt. 96-1; JA-365 ¶ 18, JA-401-405.

5.    Various improper justifications in the ultimate denial of the building permits.  JA-371 ¶ 52; JA-537; JA-372-373 ¶ 62; JA-636.

---

[15] Proof of discrimination can be established "by showing that animus against the protected group 'was a significant factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg*, 67 F.3d at 425 (citations omitted).

6. Demanding and reviewing information far beyond the scope of the normal building permit review process. JA-218 ¶ 9; JA-238-245.

7. Demanding information that was not previously demanded with respect to other applications or that had already been provided. JA-218 ¶ 7; Dkt. 99-3; JA-218 ¶ 8; Dkt. 99-4.

8. Not posting minutes of Town Board meetings. JA-366 ¶ 25.

9. Attorneys engaged in conflicting representation for the ZBA and the Town's Building Department. JA-85-88 ¶¶ 314-35; JA-218 ¶ 12, JA-253-259; JA-306; JA-219 ¶ 14, Dkt. 99-27.[16]

10. Other attorneys from Afzali's firm represented the Building Inspector at the ZBA hearing, who were then observed texting back and forth with Afzali during the proceedings. JA-88-89 ¶¶ 333-34, 341-42; JA-306; JA-149-150 ¶¶ 1-10; JA-151 at 00:36.

11. Accepting amicus briefs from opponents of the development but not from those who were critical of the Town's actions. JA-90-92 ¶¶ 356-65.

---

[16] The same attorney who had counseled the Town Building Inspector (and likely drafted his denial letter (*see* JA-218 ¶ 12, JA-253-259)) was then appointed to counsel the "impartial" body (the ZBA) that was to review the same. Other attorneys from Afzali's firm then represented the Building Inspector and the Town at the ZBA hearing. JA-219 ¶ 15; JA-306. The ZBA failed to disqualify Afzali or otherwise address this obvious conflict in any way. JA-307-313 at 3:15-9:18.

12. Exclusion of documents submitted by the Plaintiffs from the record. JA-92 ¶¶ 366-67; JA-220 ¶ 23; Dkt. 99-18.

13. The ZBA refusing to issue subpoenas to permit Plaintiffs to support their application. JA-89-90 ¶¶ 347-52; JA-219 ¶ 18, JA-342-343 at 75:14-76:6; JA-219 ¶ 16, JA-320-323 at 49:13-52:24, JA-324-330 at 110:6-116:17; JA-219 ¶ 17, JA-335-337 at 174:23-176:20; JA-220 ¶ 19, JA-346-348.

14. Improper discussions by the ZBA taking place outside the ZBA proceedings, including ZBA members seen secluded with the Building Department's special counsel immediately after a hearing. JA-89 ¶ 346, JA-93-94 ¶¶ 370-76; JA-378 ¶¶ 97-98.

15. The ZBA adopting a Resolution denying the appeal that it had never seen, considered, or even requested to be drafted prior to such adoption. JA-382 ¶ 125, JA-819-820, JA-823, JA-827-828 at 2:24-3:2, 6:18-20, 10:2-11:12; JA-149, 150 ¶¶ 1-6, 9-10, JA-152 at 11:38-12:50.

The dignitary harm of these actions also has caused Plaintiffs another independent injury. Prior to reversing itself, the District Court acknowledged that it "does not doubt discrimination of the kind alleged here works a deeply painful dignitary harm on its targets." *Lost Lake Holdings*, 2023 WL 8947154, at *7. Such holding was supported by this Court's precedents.

44

"[S]tigmatizing members of [a] disfavored group as innately inferior and therefore as less worthy participants in the political community" – *i.e.*, discrimination – is an actual and concrete injury sufficient to confer standing.

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019) ("*Tartikov*"), *cert. denied*, 141 S. Ct. 885 (2020). *See also Cath. Charities Bureau, Inc.* v. *Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 248 (2025) (under both the Free Exercise Clause and the Establishment Clause, "Government actions that favor certain religions . . . convey to members of other faiths that 'they are outsiders, not full members of the political community.'" (citation omitted)). *BMG* has not changed this principle.

This Court left open the question in *Sunrise Detox* of whether plaintiffs who suffer dignitary harms due to hostility can "seek immediate recompense . . . even in the absence of a final decision" since plaintiff did not seek damages but only an injunction for the ultimate approval it sought. 769 F.3d at 123; *see also Sayville*, 43 F.4th at 296 n.5. Plaintiffs here seek damages for their dignitary harms for the antisemitic animus directed at them and their exclusion from equal participation in the political process because of their religion and race, presenting an opportunity to clarify the question.

Plaintiffs have standing to assert such dignitary harms, as they include two Hasidic Jews that seek to live in the Development, and the other principal of the LLC

45

Plaintiffs is a Hasidic Jew, who also intends to live in the Development.[17] JA-36 ¶¶ 2, 3, JA-37-39 ¶ 7, JA-40 ¶ 12, JA-41 ¶ 18, JA-110 ¶¶ 497-98, JA-123 ¶ 568. *See, e.g., Havens Realty Corp.*, 455 U.S. at 376 (deprivation of social benefits of living in an integrated neighborhood constitutes cognizable injury). Plaintiffs have suffered these dignitary injuries, regardless of what further process is followed, and regardless of the outcome of the building permit process. The harm cannot be undone.

## IV. THE DISTRICT COURT ERRED IN FAILING TO CONSIDER PLAINTIFFS' FACIAL CHALLENGES TO THE TOWN BOARD'S ACTIONS.

Plaintiffs also challenge various actions of the Town Board on their face, including the Town Board's Resolutions and the increase in the Parks and Playground fee. *See* JA-131 ¶ B (seeking declaration that actions are "void, invalid and unconstitutional"). These facial challenges are immediately ripe. This Court has explained that "a plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in 'several ways,' including by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or <u>a facially neutral policy</u>

---

[17] These damages are in addition to the economic damages Plaintiffs have already sustained, as the developers are "aggrieved persons" under the FHA. JA-134-135 ¶¶ N-Q. *See Anderson Group LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015); *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 426-28 (S.D.N.Y. 2005) (developer has standing where it "suffered economic losses and other hardships as a result of defendant [village's] allegedly discriminatory application of [a zoning law]").

46

that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) (emphasis added); *Tartikov*, 945 F.3d at 110-11 (same). Further, "'facial' challenges to regulation[s] are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum,* 520 U.S. 725, 736 n.10.

The District Court relied on language from this Court's decision in *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006), that "[a] 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." SPA-14. However, this ignores the third type of facial challenge to discriminatory laws, as explained by the Court in *Pyke* and *Tartikov*; *see also Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 176 (2d Cir. 2024) ("Once discriminatory motive is established, or as here, assumed, a statute's facial neutrality becomes immaterial"). The Plaintiffs allege that the Town Board's actions were motivated by discrimination against Orthodox Jews and have the effect of discriminating against them.

Plaintiffs' challenges to the Town Board's Resolutions[18] and other actions–

---

[18] Town Board actions such as the fee-increase ordinance and the targeted Resolutions are "laws" for the purpose of facial challenges. *See, e.g., Livant v. Clifton*, 334 F. Supp. 2d 321, 326 (E.D.N.Y. 2004), *aff'd*, 272 F. App'x 113 (2d Cir. 2008), ("Here, the Board's actions in holding a hearing, voting, and approving a resolution which authorized the removal of a nuisance ... are clearly legislative in nature."); *Daly v. Eagan*, 77 Misc. 2d 279, 282 (N.Y. Sup. Ct. 1972) (holding that the "court finds no controlling difference between a resolution and an ordinance other than that the ordinance is a more formal resolution").

which go far beyond the building permit applications at issue in the ZBA denial–to ban *any* further development of the approved project are similar to those at issue in *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 597-610 (S.D.N.Y. 2013), *aff'd*, 945 F.3d 83 (2d Cir. 2019). Agreeing that the claims were facial, the district court there did not apply *Williamson County*'s ripeness doctrine. *Id.* On appeal, this Court affirmed and upheld the ruling with respect to the village's 2007 Dormitory and Wetlands Laws, notwithstanding the absence of any application. 945 F.3d at 110-124; *see also Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 167 (3d Cir. 2006) (concluding the Equal Protection challenge to local law designed to block concrete company's ongoing efforts to locate in town was facial because "the Township knew exactly how appellants intended to use their land and passed the Ordinance specifically tailored to prevent that use.").

Since Plaintiffs challenge the Town Board's actions in their entirety because they were enacted with a discriminatory purpose and have such a discriminatory effect, these are facial challenges that ripened the moment they were adopted. *See Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 374 (2d Cir. 2004) (plaintiff "need not have first sought and been denied *any* permit prior to filing a facial challenge"); *MacDonald v. Safir,* 206 F.3d 183, 189 (2d Cir. 2000) (same); *Charette v. Town of Oyster Bay*, 159 F.3d 749, 757 (2d Cir. 1998) (same).

48

**V. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' DUE PROCESS CLAIMS**

A. <u>Substantive Due Process</u>

Plaintiffs' substantive due process rights are violated if they can demonstrate that "(1) the regulation on its face deprives [them] of a constitutionally protected property interest, and (2) the regulation lacks any rational relationship to a legitimate government interest." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 352 (S.D.N.Y. 2000), *aff'd,* 252 F.3d 645 (2d Cir. 2001); *see also Winston v. City of Syracuse*, 887 F.3d 553, 566-67 (2d Cir. 2018).

The District Court did not dispute that Plaintiffs had adequately pleaded a vested property interest. SPA-15 n.2. Plaintiffs (and their predecessors, whose interests Plaintiffs acquired) engaged in the "substantial expenditures and substantial construction" necessary for property rights to vest under New York law, including utilities, paved roads, miles of graded road sub-bases, miles of water and sewer lines, miles of stormwater collection and management systems and networks, a sales building, and a security building. JA-51 ¶ 82; JA-376 ¶ 89, JA-1480 ¶¶ 92, 97-98, Dkt. 117-17, Dkt. 117-18. *See RC Enters. v. Town of Patterson*, 840 N.Y.S.2d 116, 117 (2007). Courts look to state law to determine if fundamental property rights exist. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007).

Instead, the District Court found that Plaintiffs could not demonstrate that the "challenged regulations or ordinances 'on their face lack <u>any</u> rational relationship

49

to a legitimate government interest.'" SPA-15 n.2 (emphasis in original) (citing *Kittay*, 112 F. Supp. 2d at 352). Plaintiffs have alleged that the sole basis for the Town's actions was religious animus against Hasidic Jews. JA-36-37 ¶¶ 6-7; JA-39-40 ¶ 11; JA-61 ¶ 143; JA-63 ¶ 154; JA-64 ¶ 166; JA-67 ¶ 184; JA-72 ¶ 234; JA-84-85 ¶ 311; JA-100 ¶ 423; JA-103-104 ¶ 448; JA-104 ¶ 452; JA-107 ¶ 477. This type of constitutional injury supports a substantive due process claim. *See supra*, Argument §§ II(B) and III.

The District Court also concluded that Plaintiffs had not asserted any facial claims to support a substantive due process cause of action, SPA-15 n.2, which is patently incorrect, *see supra*, Argument § IV. *See also Cnty. Concrete Corp.*, 442 F.3d at 166 ("a facial substantive due process challenge to a zoning ordinance—asserted on the theory that the law as a whole is arbitrary, capricious and unreasonable—is ripe even if the plaintiff did not seek a variance from the zoning ordinance."); *see also Smithfield Concerned Citizens v. Town of Smithfield,* 907 F.2d 239, 242 (1st Cir. 1990); *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1215 (6th Cir. 1992).

B. Procedural Due Process

The District Court did not separately analyze Plaintiffs' procedural due process claim. However, this Court has signaled that a court should "[evaluate] whether constitutional injury had already been inflicted," prior to applying

50

*Williamson County's* prong-one ripeness to a procedural due process claim. *Adrian v. Town of Yorktown*, 210 F. App'x 131, 133 n.2 (2d Cir. 2006); *accord Bowlby v. City of Aberdeen*, 681 F.3d 215, 222 (5th Cir. 2012) ("A due process injury is therefore complete at the time process is denied."). *See also Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 893 (6th Cir. 1991) (applying *Williamson* to procedural due process claims was improper); *Murphy*, 402 F.3d at 349-50 (recognizing *Nasierowski's* holding and differential treatment of procedural due process claims).

Plaintiffs here challenge the actions undertaken in the building permit denial and ZBA process, which Plaintiffs claim were rife with irregularity and animus. Whether *Williamson County* applies to procedural due process claims depends on whether a landowner alleges immediate injuries independent of a zoning decision. *See Adrian*, 210 Fed. App'x. at 133 n.2. While *Williamson County* applies to due process claims if these claims arise out of "the same nucleus of facts as a takings claim," *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 515 (2d Cir. 2014) (internal citations omitted), *cert. denied*, 574 U.S. 1121 (2015); *see Kowalczyk v. Barbarite*, 594 F. App'x 690, 692 (2d Cir. 2014), injuries that are immediate and independent from the zoning decision render a procedural due process claim immediately ripe. *See Nasierowski*, 949 F.2d at 894-95.

51

Two types of injuries ripen a procedural due process immediately. First, "the allegedly infirm process is an injury in itself." *See Adrian v. Town of Yorktown*, No. 03 CIV. 6604 (MDF), 2007 WL 1467417, at *5 (S.D.N.Y. May 16, 2007) (citing *Nasierowski*, 949 F.2d at 894). As discussed above, Plaintiffs have been deprived of vested property interests as a result of the discriminatory process to which they were subjected.

Second, the dignitary harm discussed above is another type of immediate injury. Indignity, stigma, and related harms to reputation are a valid injury under the Fourteenth Amendment and have satisfied Article III injury-in-fact. *See Allen v. Wright*, 468 U.S. 737, 755 (1984). Dignitary harm—sending the message of hostility and exclusion—is immediate and cognizable in the context of land use and local resolution. *See Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 111 F. Supp. 3d 459, 488 (S.D.N.Y. 2015) (finding that the plaintiffs sufficiently alleged a due process claim based on the Village's hostility and actions that were "arbitrary and designed to target current and prospective Hasidic Jewish residents"). The Supreme Court recently reaffirmed that sending a message of unequal treatment in the political community based on religion is a palpable injury under the Free Exercise and Establishment Clauses. *See Cath. Charities Bureau,* 605 U.S. at 248. *See also LeBlanc-Sternberg*, 67 F.3d at 425 ("[a]n injury need not be economic or

52

tangible in order to confer standing." (citation omitted)). Plaintiffs' allegations thus meet the immediate and independent injury criteria for a procedural due process claim.

**VI.   THE DISTRICT COURT FAILED TO ADDRESS SEVERAL OTHER CLAIMS THAT WERE NOT SUBJECT TO A *WILLIAMSON COUNTY* "RIPENESS" ANALYSIS.**

A. FHA Retaliation Claim.

The District Court's opinion makes no mention whatsoever of Plaintiffs' FHA retaliation claim under 42 U.S.C. § 3617; *see Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002), yet dismissed it together with dissimilar claims as not ripe.

Plaintiffs have alleged a ripe claim of retaliation. First, filing this lawsuit is a "protected activity." *See, e.g., Mazzocchi v. Windsor Owners Corp.*, No. 11 CIV. 7913(AT), 2013 WL 5295089, at \*12 (S.D.N.Y. Sept. 17, 2013), and Defendants "were aware that" Plaintiffs were "complaining about discrimination." *See id.* Plaintiffs also allege a series of adverse actions starting in 2023 taken against them in direct response to their filing suit. *See supra*, § III (discussing Stop Work Orders, 2023 Resolutions and Notice, and the retaliatory state court lawsuit).

This Court has held that retaliation claims are not subject to *Williamson County*'s ripeness requirements and need not await a final administrative decision. *Dougherty*, 282 F.3d at 89-90. Rather, it is actionable as soon as the retaliatory act

occurs. *Id.*; *see also Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 829-31 (9th Cir. 2003) (holding no final agency action required to ripen retaliation claim).

The retaliation claims here caused injury to the Plaintiffs that are separate and distinct from the ZBA's affirmance of the denial of their building permits. The Stop Work Order halting infrastructure work and all other work on the Development created an immediate injury. The unfounded reopening of SEQRA not only created additional significant delay and expense but also served to block other government agencies from issuing permits related to the Development. JA-104 ¶ 449. These retaliatory actions also independently inflicted dignitary harm on Plaintiffs as Jews, sending a message to them that they are "outsiders, not full members of the political community." *Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n,* 605 U.S. 238, 248 (2025) (citation omitted). As this Court held in *LeBlanc-Sternberg*, under the FHA "an injury need not be economic or tangible in order to confer standing." 67 F.3d at 425. This Court's broad reading of standing under the FHA (*see supra*, § I(A)(3)), combined with its holding in *Dougherty* that *Williamson County* is inapplicable to retaliation claims, makes clear that the Plaintiffs have ripe claims of retaliation.

54

B. New York Civil Rights Law § 40-c.

Similar to Plaintiffs' FHA retaliation claim, New York's Civil Rights Law § 40-c also describes an independent harm: that "No person shall, because of race, creed . . . be subjected to any discrimination in his or her civil rights . . . in the exercise thereof, by . . . the state or any agency or subdivision of the state." N.Y. CIV. RIGHTS LAW § 40-c (McKinney). "This statute is applicable to suits alleging retaliation." *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 84 (N.D.N.Y. 2011), *aff'd,* 485 F. App'x 465 (2d Cir. 2012) (internal citations omitted).

For the reasons described above, Plaintiffs' allegations that they were injured by the Defendants' various actions also state ripe facial and as-applied challenges under section 40-c. *See, e.g., Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*, 98 F. Supp. 2d 347 (S.D.N.Y. 2000). The District Court failed to address this claim, and its dismissal was likewise erroneous.

C. Prospective Business Advantage Claim.

The District Court also failed to address Count XXI of Plaintiffs' Amended Complaint, yet dismissed it as not ripe as well. The injury asserted here stems from an interference with business relations, a state law tort that does not require a land use decision that is subject to a finality requirement.[19] *See generally Guard-Life*

---

[19] Plaintiffs' allegations included that "contracts with craftsmen, laborers, and suppliers that were intentionally interfered with by the Defendants' Actions" and "the loss of home sales to interested and identified buyers, . . . ." JA-113-114 ¶¶ 525-26.

*Corp. v. S. Parker Hardware Mfg. Corp.,* 406 N.E.2d 445 (N.Y. 1980). The District Court was silent on this issue, and there is no basis to extend *Williamson County* to such claims.

### D. Article 78 Claim.

Finally, the Court also dismissed Count XXII of Plaintiffs' Amended Complaint, brought pursuant to Article 78 of the New York Civil Practice Law and Rules,[20] again without any discussion. This error is particularly egregious, as there is no basis to apply *Williamson County's* doctrine to state law judicial review of an agency decision, which must be filed within thirty days of the decision. *See* N.Y. TOWN LAW § 267-c (McKinney); N.Y. C.P.L.R. § 217 (McKinney).

An Article 78 proceeding is the vehicle under New York law to obtain a determination as to "whether a determination [by the ZBA] was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, . . . ." N.Y. C.P.L.R. § 7803 (McKinney). The "determination" is the ZBA's decision denying Plaintiffs' appeal. There is no support or authority for the position that it is subject to any type of additional "ripeness" analysis, yet the District Court appeared to erroneously group it together

---

[20] The court had supplemental jurisdiction over this claim. *See, e.g., Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 560 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2d Cir. 2007) ("[T]his Court has independent authority to address WDS's claim that the ZBA's decision was arbitrary and capricious in its exercise of supplemental jurisdiction as governed by New York law and N.Y.C.P.L.R. § 7801 *et seq.*, pursuant to 28 U.S.C. § 1367.").

with Plaintiffs' "land use claims" (SPA-24) and dismissed it on that basis. It would be an absurd result if a party were to lose its state law right to seek review of a ZBA decision that it believes was arbitrary and capricious because of *Williamson County's* prudential ripeness requirements.

## CONCLUSION

The Order entered in the District Court granting Defendants' Motion to Dismiss should be reversed and this matter remanded to the District Court for further proceedings.

Dated: Washington, DC
     December 8, 2025

/s/ Eric W. Treene
ERIC W. TREENE, ESQ.
ROMAN P. STORZER, ESQ.
STORZER & ASSOCIATES, P.C.
*Attorneys for Plaintiffs-Appellants*
1025 Connecticut Avenue, NW
  Suite 1000
Washington, DC 20036
(202) 857-9766

57

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,963 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: Washington, DC
      December 8, 2025

                       /s/ Eric W. Treene
                       ERIC W. TREENE, ESQ.
                       ROMAN P. STORZER, ESQ.
                       STORZER & ASSOCIATES, P.C.
                       *Attorneys for Plaintiffs-Appellants*
                       1025 Connecticut Avenue, NW
                         Suite 1000
                       Washington, DC 20036
                       (202) 857-9766

SPECIAL APPENDIX

**TABLE OF CONTENTS**

<b>Page</b>

Opinion and Order Granting Motion to Dismiss, Entered July 9, 2025…………..…... SPA-1

Order to Enter Judgment, Entered August 22, 2025………………………...……….. SPA-26

Judgment Entered August 22, 2025………………..…………………………………… SPA-27


**Statutes:**

42 U.S.C. § 3602………………………………………………………………………….. SPA-28

42 U.S.C. § 3604(a)……………………………………………………………….…..…... SPA-29

42 U.S.C. § 3604(b)…………………………………………………………………………. SPA-29

42 U.S.C. § 3617…………………………………………………………….…….…..…... SPA-29

42 U.S.C. § 1982………………………………………………………………….………... SPA-29

42 U.S.C. § 1983………………………………………………………………….…..…... SPA-30

N.Y. Civ. Rights Law § 40-c………………………………………………………………. SPA-30

 N.Y. Town Law § 267-b…………………………………………………….…….....…. SPA-30

N.Y. C.P.L.R. Law Article 78……………………………………………………………… SPA-31


**Forestburgh Local Laws:**

Town of Forestburgh Code § 180-38………………………………..……..….…..…... SPA-35

Town of Forestburgh Code § 180-40……………………..…………………..……………… SPA-35

Local Law No. 4 of 2018…………………………………..……..….…………………... SPA-35

Local Law No. 1 of 2020……………………..……..……………………………………. SPA-35

Local Law No. 1 of 2022…………………………………..……..….………………….. SPA-36

Resolution 2023-02………………..…………………………………..………………... SPA-39

**Rules**

Fed. R. Civ. P. 12 …………………..………………..……………………..…………... SPA-41

**Constitutional Provisions:**

U.S. Const. Art. III § 2.………………………………………………………………… SPA-42

U.S. Const. Amend. I.…………………………………………………………………… SPA-42

U.S. Const. Amend. V.……………………………………………………..……….. SPA-42

U.S. Const. Amend. XIV § 1.……………………………………………….………... SPA-42

N.Y. Const. Art. I § 3 .…………………………………………………..…………… SPA-43

N.Y. Const. Art. I § 5 .…………………………………………………..…………… SPA-43

N.Y. Const. Art. I § 6 .…………………………………………………..…………… SPA-43

N.Y. Const. Art. I § 7 .…………………………………………………..…………….. SPA-44

N.Y. Const. Art. I § 9 .…………………………………………………..…………… SPA-44

N.Y. Const. Art. I § 11 .…………..……………………………………..…………… SPA-45

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LOST LAKE HOLDINGS LLC, a domestic          :
limited liability company; MISHCONOS        :
MAZAH LLC, a domestic limited liability     :
company; RABBI MORDECHAI                     :
HALBERSTAM; and ROSE HALBERSTAM,            :
                    Plaintiffs,   :
v.                                           :
                                         :
THE TOWN OF FORESTBURGH; THE                 :
FORESTBURGH TOWN BOARD;                      :
FORESTBURGH ZONING BOARD OF                  :     **OPINION AND ORDER**
APPEALS; DANIEL S. HOGUE, JR. in his         :
personal capacity; STEVE BUDOFSKY, in his    :     22 CV 10656 (VB)
personal capacity; SUSAN PARKS-LANDIS, in    :
her personal capacity; KAREN ELLSWEIG, in    :
her personal capacity; VINCENT GALLIGAN,     :
in his personal capacity; RICHARD ROBBINS,   :
in his personal capacity; GLENN A.           :
GABBARD, in his personal capacity and his    :
official capacity as Building Inspector of the :
Town of Forestburgh,                         :
                    Defendants.   :
                                         :
----------------------------------------------------------------x

Briccetti, J:

      Plaintiffs Lost Lake Holdings LLC ("LLH"), Mishconos Mazah LLC ("Mishconos"),

Rabbi Mordechai Halberstam, and Rose Halberstam bring this action against the Town of

Forestburgh (the "Town"), the Town Board, the Town Zoning Board of Appeals (the "ZBA"),

and several Town officials and employees.  Plaintiffs allege defendants, motivated by religious

discrimination, prevented construction of the "Lost Lake Resort" development in Forestburgh,

New York.  In so doing, plaintiffs allege defendants violated plaintiffs' rights under the United

States Constitution, the New York State Constitution, the Fair Housing Act ("FHA"), 42 U.S.C.

§ 1982, and the New York State Civil Rights Law.  Plaintiffs also bring claims for trespass and

1

tortious interference with prospective business advantage. Plaintiffs seek damages and declaratory and injunctive relief. They also ask this Court to annul and vacate, under Article 78 of the New York Civil Practice Law and Rules, the ZBA's decision affirming the decision of the Town's building inspector to deny plaintiffs building permits to construct homes on the Lost Lake property.

Now pending is defendants' partial motion to dismiss for lack of subject matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(c). (Doc. #162). Relying principally on BMG Monroe I, LLC v. Vil. of Monroe, 93 F.4th 595 (2d Cir. 2024) ("BMG Monroe"), which was decided after this Court had ruled plaintiffs' land use claims were ripe for adjudication, defendants argue the land use claims are actually unripe and thus non-justiciable because plaintiffs failed to obtain a "final decision" on building permit applications to develop certain lots on the Lost Lake property.

For the reasons set forth below, the motion to dismiss the land use claims for lack of ripeness is GRANTED.

**BACKGROUND**

The parties have submitted memoranda of law and supporting declarations and exhibits. Together with the pleadings, they reflect the following facts.

I.    Double Diamond and Conditional Approval of the Lost Lake Resort

The Town of Forestburgh is a rural community in Sullivan County, New York, with a population of approximately 900. In 2008, a developer named Double Diamond, Inc. ("Double Diamond"), submitted an application to purchase a 3.3 square-mile undeveloped parcel of land in the Town, with the intention of developing it into the "Lost Lake Resort." According to Double Diamond's proposal, the Lost Lake Resort would be an upscale, resort-style destination with a

2

gated community, hotel and conference facilities, and recreational amenities, including an 18-hole golf course, clubhouse and restaurant, a health and wellness spa, tennis courts, and walking trails.

At the time of Double Diamond's proposal, the Lost Lake property was located within a residential zoning district. As a result, the property was subject to municipal regulations governing population density and size limits, which restricted lots to a minimum of 100,000 square feet with a maximum of one dwelling per lot. Because the existing residential zoning regulations would not permit Double Diamond's proposed development plans for Lost Lake, Double Diamond applied for a zoning change to a Planned Development District ("PDD") under the Town's applicable PDD law, which authorized the Town to establish new density standards and grant density changes to proposed projects. In accordance with the State Environmental Quality Review Act ("SEQRA") and the Environmental Conservation Law ("ECL"), the Town was designated under SEQRA to commence an environmental review related to Double Diamond's application.

As part of the SEQRA environmental review process, Double Diamond prepared an environmental impact statement ("EIS"). An EIS analyzes potential adverse environmental effects of a proposed development or action and identifies how such impacts may be avoided or minimized. Pursuant to the EIS process, the Town Board conducted its own review, including public scoping and public hearings, and directed Double Diamond to file draft ("DEIS") and final ("FEIS") environmental impact statements.

In the DEIS and FEIS, Double Diamond represented that the "target market" for the Lost Lake Resort was individuals seeking "to build their second or retirement home here in Sullivan County for recreation and leisure, and as a real estate investment." (Doc. #112-3 at 2–4).

3

Accordingly, property lots at Lost Lake Resort were to be "developed by the individual lot owners over time in accordance with Design Standards and subject to review and approval by the Lost Lake Architectural Control Committee." (Id. at 1–4). As for the environmental impacts of the proposed project, Double Diamond identified potential adverse environmental impacts and outlined mitigation measures to address these adverse impacts. (See, e.g., Doc. #112-3 at 3.2–20, 3.3–15, 3.4.3).

On May 18, 2011, after a multi-year review process, the Town Board issued its SEQRA Findings Statement. (Doc. #112-5). A SEQRA Findings Statement is prepared following the acceptance of the FEIS and identifies the social, economic, and environmental considerations involved in a proposed action. According to the Findings Statement, the Lost Lake Resort would consist of single-family residential lots, single-family cottages, and townhouse-style condominiums, as well as recreational and dining facilities. (Id. at 7). Residences would be constructed by individual owners of lots within the property site and would be built "in full accordance with Design Guidelines" that stipulated a specific design theme and sustainability guidelines. (Id.). The Findings Statement also noted that the proposed density of the project, as a "second home residential development" with "recreation-related commercial uses[,] was determined by the Town Board to be consistent and compatible" with the surrounding community. (Doc. #112-5 at 9–10). Finally, the Town Board concluded that Double Diamond's proposal would "avoid[] or minimize[] adverse environmental impacts" by incorporating the "mitigative measures that were identified as practicable in the DEIS, FEIS, and this Findings Statement." (Id. at 73).

On July 7, 2011, the Town Board adopted Local Law 3 of 2011, which amended the Town's then-existing PDD regulations to allow for the density and size limitations to

4

accommodate Double Diamond's proposal. (Doc. #111-3). On August 4, 2011, the Town Board approved Double Diamond's PDD application and voted to rezone Lost Lake as a PDD. (Doc. #112-9) (the "2011 PDD Approval"). As a result, the Lost Lake site was rezoned from a residential zoning district to a PDD "subject to restrictions and mitigation requirements incorporated into the master plans [] and SEQRA Findings Statement." (Doc. #112-14 at 14). The 2011 PDD Approval also vested the Town Board with "exclusive review and approval jurisdiction over the subdivision and site plan applications for the Lost Lake Resort." (Doc. #112-9 at 10).

In 2012 and 2013, the Town Board conditionally approved Double Diamond's proposed site plan and subdivision plat. (Docs. ##112-10, 112-11). Thereafter, Double Diamond began constructing the necessary infrastructure on the property, such as roads and utilities. However, no residences were constructed.

## II.    Plaintiffs' Purchase and Development of the Lost Lake Resort

In 2019, Double Diamond put the Lost Lake project up for sale. In July 2020, LLH and Mishconos purchased the project.

The principals of LLH and Mishconos are practicing Hasidic Orthodox Jews. According to plaintiffs, when the Town and its residents learned the new owners of Lost Lake were Hasidic Jews, the Town embarked on a campaign to preclude plaintiffs from building Lost Lake in an effort to prevent Hasidic Jews from moving to Forestburgh.

### A.    Building Permit Applications

In the fall of 2020, soon after purchasing the project, plaintiffs submitted several building permit applications for the construction of single-family homes on the Lost Lake property. Defendant Glenn Gabbard, in his capacity as the Building Inspector for the Town, reviewed the

5

applications.  Gabbard approved the first two applications, for construction on Lots 301 and 302, respectively.  (Docs. ##111 ¶ 7, 111-1, 111-2).

Gabbard asserts in a sworn declaration that, after issuing the first two building permits, he discovered misrepresentations and deficiencies in the applications.  (Doc. #111 ¶ 8).  Specifically, Gabbard states plaintiffs misrepresented that they owned Lot 302, and that both applications were submitted with misleading and false supporting documentation.  (Id.).  Gabbard ultimately revoked the permit for Lot 302 because of its disputed ownership, but he permitted construction to begin on Lot 301.  (Id. ¶ 9).  Plaintiffs commenced and completed construction of a single-family home on Lot 301.

In June 2021, plaintiffs submitted a building permit application for Lot 303 (the "Lot 303 application.").  (Doc. #111 ¶ 18).  According to Gabbard, the Lot 303 application contained the same misrepresentations and deficiencies as the Lot 301 and 302 applications.  (Id. ¶ 19).  Specifically, Gabbard found the Lot 303 application was incomplete because it did not contain the requisite documentation.  After Gabbard informed plaintiffs of the deficiencies in the application, plaintiffs submitted additional information.  On October 7, 2021, Gabbard informed plaintiffs that the deficiencies in the Lot 303 application were still outstanding.  (Doc. #111 ¶¶ 31–32).

Plaintiffs subsequently withdrew the application and submitted a second application for Lot 303.  (Doc. #111 ¶ 33).  Because the second application for Lot 303 did not cure the original deficiencies, Gabbard denied the second application on November 23, 2021.  Gabbard issued a memorandum explaining that he was denying the Lot 303 application because, among other

6

reasons, it was "inconsistent with the 2013 project approval documents."  (Doc. #100-22; Doc. #111 ¶ 36).

On January 6, 2022, plaintiffs filed fourteen additional building permit applications. Gabbard denied all fourteen applications, citing the same defects as contained in the Lot 303 application.  (Doc. #60 ("Am. Compl.") ¶¶ 269–70; Doc. #111 ¶¶ 38–39).

B.    ZBA Appeal

On January 20, 2022, plaintiffs commenced an administrative appeal with the ZBA, challenging Gabbard's denial of the Lot 303 application as well as the fourteen additional building permit applications.  On November 15, 2022, after a six-day evidentiary hearing, the ZBA affirmed Gabbard's denial of all the applications.  (Doc. #112-14 at 6, 33–35).

In a written decision, the ZBA concluded that plaintiffs' building permit applications demonstrated their intention to build a substantially different development than the one the Town had approved under the site's prior owners.  According to the ZBA, the Town approved the Lost Lake project because Double Diamond had represented it would be an "upscale" recreational resort occupied by seasonal residents whose environmental and economic impact on the Town would be offset by extensive mitigation measures.  In contrast, the ZBA determined that plaintiffs intended to develop the Lost Lake property into a high-density housing development designed for full-time residents and families—without the environmental controls or mitigation measures identified during the earlier environmental review process.  (Doc. #112-14 at 35). Plaintiffs' plans for the property, therefore, were "inconsistent with and materially different from the terms and conditions set forth and granted to LLH's predecessor Double Diamond."  (Doc. #112-14 at 34).

The ZBA observed that its decision would trigger several provisions in the PDD approval process. First, the ZBA's finding that plaintiffs' proposed development plans differed from the approved plans would trigger a PDD condition stating that any modification to a subdivision or site plan that "exceed[ed] the overall limits of [the] PDD approval" may require further review by the Town Board. (Doc. #112-14 at 35). Second, pursuant to the SEQRA Findings Statement, plaintiffs would be required to undergo an additional environmental assessment of any portions of the proposed development that deviated from the master plan or evaluations in the DEIS and FEIS. (Id.). Finally, the ZBA found the Town Board retained authority to enforce the conditions in the 2011 PDD Approval resolution, and concluded the Town Board "remain[ed] the sole authority to amend any term, restriction and condition of the Resort PDD." (Doc. #112-14 at 33–34).

Plaintiffs did not seek review of the ZBA's decision in state court.

C.      Post-Appeal Events

The parties dispute what happened next. Plaintiffs contend they continued to perform authorized infrastructure work on the Lost Lake property, pursuant to existing permits. Defendants, on the other hand, contend plaintiffs engaged in unauthorized construction by continuing to work on the Lost Lake site.

In January and February 2023, the Town issued a series of stop work orders demanding plaintiffs stop all construction work on the Lost Lake property and submit to an inspection of the site.

By Resolution dated February 2, 2023, the Town Board adopted the ZBA's findings and determination. In accordance with the ZBA's findings, the Town determined that the changes and modifications in plaintiffs' building permit applications constituted "changes in the project"

8

or "a change in the circumstance." (Doc. #110-17 at 3). As a result, the Town Board reopened the SEQRA review process and directed plaintiffs to prepare a "supplemental environmental impact statement and obtain approvals for such modifications." (Id.). The Town Board also suspended all existing permits and approvals until plaintiffs submitted their "proposed changes to the Town Board" and obtained "necessary and appropriate modifications to the terms and conditions of the Project Approvals." (Id.).

On February 3, 2023, the Town filed a complaint against plaintiffs in New York State Supreme Court, Sullivan County, seeking to enjoin plaintiffs from infrastructure construction. On March 30, 2023, the Town Board adopted a resolution instigating a supplemental environmental review of the Lost Lake site under SEQRA.

It is undisputed that plaintiffs at no point submitted any supplemental materials to the Town Board or otherwise sought to modify any of the Double Diamond approvals.

D.    Evidence of Alleged Discrimination

Plaintiffs claim they were subjected to discriminatory treatment from the moment they purchased the Lost Lake property and assert defendants' actions are motivated by discriminatory animus against Hasidic Jews. In particular, plaintiffs point to anti-Semitic statements made by alleged residents of Sullivan County, both at public hearings and on websites and online forums discussing the project. For example, soon after plaintiffs purchased Lost Lake, they contend the Town's Supervisor told his constituents at a Town Board meeting that "[t]here will be much more oversight than Lost Lake had." (Am. Compl. ¶ 125). Plaintiffs also allege discriminatory public comments were made in response to an article about plaintiffs' purchase of the property (id. ¶¶ 117–19), and that several named defendants made discriminatory remarks about plaintiffs and expressed concerns about a "religious takeover." (Doc. #177-12).

9

In addition, plaintiffs allege defendants intentionally interfered with plaintiffs' attempts to develop the Lost Lake site. According to plaintiffs, the Town preemptively hired outside counsel to prevent plaintiffs from constructing homes on the property, even though no building permit applications or litigation were pending at the time. (Am. Compl. ¶¶ 139, 141–43). In addition, on July 2, 2021, the Town Board voted to increase the Town's Parks & Playgrounds fee, which plaintiffs allege would increase the cost of developing Lost Lake by approximately $4 million. (Id. ¶¶ 158–66). As plaintiffs contend the fee increase would apply only to Lost Lake, and not to other subdivisions or development properties in the Town, plaintiffs allege this fee increase was motivated by discriminatory animus.

Finally, plaintiffs contend the ZBA appeals process was rife with discriminatory treatment. Plaintiffs allege that their procedural and substantive due process rights under the New York and United States Constitutions were repeatedly violated throughout the ZBA proceedings.

III.    Procedural History

On December 16, 2022, plaintiffs commenced the instant action. On June 1, 2023, plaintiffs moved for a preliminary injunction to enjoin the Town from (i) enforcing orders prohibiting development of the Lost Lake site, (ii) requiring a supplemental environmental review of the site, and (iii) pursuing a civil action in state court. (Doc. #82).

On December 28, 2023, this Court denied the motion. (Doc. #123). In doing so, the Court held plaintiffs' land use claims were ripe for adjudication because "there [was] no practical or logical reason to require plaintiffs to apply for a variance." (Id. at 10).

On January 31, 2025, defendants moved to dismiss plaintiffs' land use claims as unripe and non-justiciable. (Doc. #162). Defendants contend that the Second Circuit's decision in

10

BMG Monroe, which was decided after the Court's decision on the preliminary injunction motion, and which reaffirmed the "final decision" requirement of <u>Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172 (1985) ("<u>Williamson</u>"), requires dismissal of plaintiffs' land use claims.

## DISCUSSION

I.  <u>Ripeness</u>

Defendants contend plaintiffs' land use claims are unripe and non-justiciable because plaintiffs did not seek a variance or otherwise apply to change or vary the Lost Lake project approvals.  Accordingly, defendants argue plaintiffs did not obtain a "final decision" under <u>Williamson</u> as is required to ensure that the land use claims are ripe for adjudication.[1]

The Court agrees.

A.  <u>Legal Standard</u>

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question."  <u>Nat'l Org. for Marriage, Inc. v. Walsh</u>, 714 F.3d 682, 687 (2d Cir. 2013).  "A claim is not ripe if it depends upon contingent future events that

---

[1]  Plaintiffs argue defendants' contention that the Court lacks subject matter jurisdiction over the land use claims is misplaced, because ripeness is a prudential limitation on the exercise of judicial authority, rather than a limitation based on lack of subject matter jurisdiction. Accordingly, plaintiffs contend the Court's prior ruling on ripeness is the law of the case, and there is no justification to revisit it.  The Court disagrees.  As noted above, <u>BMG Monroe</u> was decided after the Court's previous ruling, and thus constitutes an intervening binding precedent.

Moreover, having carefully considered the parties' arguments in light of <u>BMG Monroe</u>, the Court is persuaded that there is a need to correct clear error and prevent manifest injustice. <u>See</u> <u>United States v. Quintieri</u>, 306 F.3d 1217, 1230 (2d Cir. 2002).  Thus, there are cogent and compelling reasons for the Court to reconsider its prior decision.  <u>See</u> <u>DiLaura v. Power Auth.</u>, 982 F.2d 73, 77 (2d Cir. 1992).

may not occur as anticipated, or indeed may not occur at all." Id. (quoting Thomas v. Union Carbide Argic. Prods. Co., 473 U.S. 568, 580 (1985)).

In the land use context, a claim alleging disparate enforcement of zoning regulations "is not ripe . . . until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th 287, 294 (2d Cir. 2022). "A final decision exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." S&R Dev. Estates, LLC v. Bass, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008). In the Second Circuit, ripeness is conditioned "on a property owner submitting at least one meaningful application for a variance." Murphy v. New Milford Zoning Com'n, 402 F.3d 342, 348 (2d Cir. 2005). This is because, if a developer does not follow the procedures for obtaining a variance from the appropriate government entity, the developer has "not yet obtained a final decision regarding how it will be allowed to develop its property." Williamson, 473 U.S. at 190.

The Second Circuit has "made clear that appealing to the Zoning Board of Appeals and requesting variance relief are both necessary prerequisites to ripeness." BMG Monroe, 93 F.4th at 601 (emphasis in original). In BMG Monroe, a developer plaintiff purchased a residential subdivision with pre-existing approvals in Monroe, New York, and submitted building applications inconsistent with those approvals. When the building applications were denied, plaintiff appealed the denial to the zoning board of appeals. After the zoning board of appeals sustained the denials, plaintiff never applied for a variance or otherwise sought to modify the conditions of the project approvals. The district court dismissed plaintiff's claims as unripe and

12

the Second Circuit affirmed, holding plaintiff never obtained a "final decision" on the building permit applications as required under Williamson.  BMG Monroe, 93 F.4th at 603–04.

In so holding, the Circuit emphasized that a developer bringing a federal claim challenging a municipality's denial of a building permit "must first appeal an adverse planning-board decision to a zoning board of appeals and submit at least one meaningful application for a variance."  BMG Monroe, 93 F.4th at 598 (emphasis in original).  The court held that "because avenues still remain for the [municipal authority] to clarify or change its decision," plaintiff's "failure to properly pursue administrative procedures . . . render[s] its claim unripe."  Id. at 604.

The final decision requirement is not "mechanically applied," however, and is subject to several exceptions.  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 294.  One such exception applies in circumstances when "pursuing an appeal to a zoning board of appeals or seeking a variance would be futile."  Murphy v. New Milford Zoning Com'n, 402 F.3d at 349.  Under the "futility exception," a property owner is excused from obtaining a final decision "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied."  Id.  Yet as the Second Circuit has made clear, "mere doubt that a variance application would be granted is insufficient to establish futility."  BMG Monroe, 93 F.4th at 603–04.  Similarly, evidence of alleged hostility toward a planned development is insufficient to show futility, because mere hostility does not guarantee that a variance application would be denied.  See S&R Dev. Ests., LLC v. Bass, 588 F. Supp. 2d at 463 ("Futility does not exist merely because of hostility to the developer's plans.").

Another exception to the final decision requirement applies to land use claims alleging discriminatory treatment.  "[A] plaintiff alleging discrimination in the context of a land-use dispute is subject to the final-decision requirement unless he can show that he suffered some

13

injury independent of the challenged land-use decision." Sunrise Detox V, LLC v. City of White Plains, 769 F.3d 118, 123 (2d Cir. 2014). In such cases, "a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face or the manipulation of a zoning process out of discriminatory animus to avoid a final decision," because a subsequent administrative decision "would do nothing to further define the injury." Id.

B.      Analysis

Defendants argue plaintiffs' land use claims are not ripe under BMG Monroe because they failed to seek a variance of the Lost Lake project approvals and thus failed to obtain a final decision on their building permit applications.

The Court agrees.

1.      Plaintiffs Advance As-applied Challenges

As a threshold issue, the Court must first determine whether plaintiffs' land use claims are facial or as-applied challenges, because facial challenges are automatically ripe, whereas as-applied challenges are subject to the final-decision requirement.

"A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). "An as-applied challenge, on the other hand requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." Id. at 174–75.

Plaintiffs argue their federal regulatory takings claim asserts facial challenges to certain resolutions and orders issued by the Town and is thus ripe for adjudication. The Court disagrees. Even a cursory review of plaintiffs' complaint and arguments reveals that plaintiffs challenge the

14

application of such resolutions—specifically, the Parks and Playgrounds Fee and the Stop Work Order of February 1, 2023—to them.  (Doc. #60 ¶¶ 159, 439).  Similarly, plaintiffs' discrimination claims challenge the promulgation of land use regulations "as applied" to plaintiffs.  (Id. ¶ 540).  Therefore, plaintiffs' land use claims, including their regulatory takings claims, are as-applied challenges.[2]  Accordingly, the Court must determine whether plaintiffs' land use claims satisfy the final decision requirement and are therefore ripe for adjudication.

> 2.    Plaintiffs' Failure to Seek a Variance Renders Their Land Use Claims Unripe

Turning to the merits, plaintiffs' land use claims are unripe because they failed to seek a meaningful variance to modify the approval conditions for the Lost Lake Resort.  In BMG Monroe, the Second Circuit "made clear that appealing to the [ZBA] and requesting variance relief are both necessary prerequisites to ripeness."  BMG Monroe, 93 F.4th at 601 (emphasis in original).  Therefore, as "avenues still remain[ed] for the [municipal authority] to clarify or change its decision," plaintiffs' failure to seek a variance from the Town Board renders their land use claims unripe.  Id. at 604.

---

[2]    Plaintiffs assert their claims constitute facial challenges, yet they fail to identify which specific actions or regulations are the subject of these facial challenges.  (Doc. #176 at 14) ("Plaintiffs also challenge various actions of the Town Board on their face.").  Moreover, "[t]o challenge the facial validity of a zoning regulation on substantive due process grounds, [a plaintiff] must allege that (1) the regulation on its face deprives him of a constitutionally protected property interest, and (2) the regulation lacks any rational relationship to a legitimate government interest."  Kittay v. Giuliani, 112 F. Supp. 2d 342, 352 (S.D.N.Y. 2000).  Even assuming plaintiffs can show they were deprived of a constitutionally protected interest, they fail to satisfy their burden of demonstrating that the (undefined) challenged regulations or ordinances "on their face lack any rational relationship to a legitimate government interest."  Id.  Finally, plaintiffs cite Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 945 F.3d 83, 110 (2d Cir. 2019) ("Tartikov"), to argue their claims are automatically ripe, but Tartikov is inapposite because, for the foregoing reasons, plaintiffs here do not assert facial challenges.

Plaintiffs attempt to circumvent this clear directive from the Second Circuit in several ways, but none is persuasive.

First, plaintiffs argue that, under Pakdel v. City & Cnty. of San Francisco, 594 U.S. 474 (2021), the final decision requirement is "relatively modest," and requires merely that a plaintiff show there is "no question about how the regulations at issue apply to the particular land in question." (Doc. #176 at 18). Yet Pakdel is easily distinguishable. In that case, the plaintiff property owners made two requests for an exemption that were subsequently denied, and the relevant zoning agency was later divested of authority over the variance application because the applicable statute of limitations had run. Pakdel v. City & Cnty. of San Francisco, 594 U.S. at 477–78. In those circumstances, the Supreme Court held there was "de facto finality" regarding plaintiff's exemption requests, and that plaintiffs' takings claims were ripe because there was "no question about how the regulations at issue appl[ied] to the particular land in question" as the government was clearly "committed to a position." Id. at 478–79.

Similarly, the Second Circuit has held de facto finality exists when procedural or logistical barriers, like those present in Pakdel, prevent a party from receiving a decision on a variance application. In Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown, 88 F.4th 344, 347 (2d Cir. 2023), plaintiffs applied for a variance but the relevant municipal zoning agency refused to hold a hearing on the application, failed to respond to five letters from plaintiffs attempting to schedule a hearing on the application, and informed plaintiffs' counsel that "it [would] not entertain any appeal by [plaintiffs]." Id. at 351. Moreover, the sale of the property to plaintiffs was eventually cancelled, meaning plaintiffs "had no further avenues of review." Id. In those circumstances, the claims were de facto final because they had reached a "concrete and final form." Id. at 351–52. Similarly, in Village Green at Sayville, LLC v. Town

16

of Islip, 43 F.4th 287 (2d Cir. 2022), the Circuit held that the refusal of the Town Board to hold a hearing on a variance application constituted a final decision as defined in Williamson.  Id. at 298.  As the Town Board had "made plain that it ha[d] reached a decision that, by all accounts, it intend[ed] to be final," plaintiffs' injuries were "concrete and particularized," and not "merely speculative."  Id. at 299.

Here, by contrast, plaintiffs failed to make even one application to the Town Board for a variance from the initial project proposals, and there are no procedural hurdles barring plaintiffs from applying for such a variance.  Although defendants' actions make clear their expectation that plaintiffs' building permit applications adhere to the existing project approvals, especially those pertaining to density and environmental mitigation, there is no evidence plaintiffs' applications to modify these project approvals would be denied outright.  Indeed, after the ZBA appeals process, the Town Board explicitly invited plaintiffs to apply for modifications to the project approvals that would enable their building permit applications to proceed.  (Doc. #110-17 at 3).  Plaintiffs failed to do so.  Accordingly, plaintiffs fail to shoehorn their case into the "modest" finality requirement language from Pakdel (Doc. #176 at 18), and they cannot avoid the Second Circuit's clear delineation of the contours of the final decision requirement.  See Murphy v. New Milford Zoning Com'n, 402 F.3d at 353 (land use claims unripe because plaintiffs' "fail[ure] to submit a single variance application in this matter . . . deprive[d] us of any certainty as to what use of the [plaintiffs'] property would be permitted.").

Second, plaintiffs attempt to distinguish BMG Monroe, but the Court is not persuaded. For example, plaintiffs contend that, unlike in the instant case, "there were actual conditions and mitigation measures in BMG that prohibited the sought permits" and that the plaintiffs in BMG Monroe failed to appeal to the ZBA.  (Doc. #176 at 20–21).  But the facts of BMG Monroe

17

actually coincide closely with the facts of this case. There, as here, the plaintiff developers alleged defendants' denials of building permits for a residential development project were motivated by discriminatory animus against the Hasidic Jewish community. There, as here, plaintiffs contended the building permit applications complied with all prior development approvals and argued defendants' stated reasons for rejecting the applications—namely, noncompliance with existing approvals and mitigation measures—were pretextual. And there, as here, plaintiffs disputed the need to seek further administrative review of their permit applications and argued the zoning board of appeals' decision constituted a "final decision" under Pakdel.

The Second Circuit in BMG Monroe firmly rejected these arguments. The court held that plaintiffs had failed to obtain a final decision because, "in sharp contrast [to Pakdel], [defendant] has never denied a single request for a variance" from plaintiff, and so it "cannot be said that [defendant] is committed to a position that resembles that of the defendant in Pakdel." BMG Monroe, 93 F.4th at 604 (emphasis in original). Instead, when plaintiffs sought building permits that deviated from the project proposals, plaintiffs were required to seek a variance before proceeding to federal court. Id. at 603.

The same must be said here. Although plaintiffs' building permits were found to be non-compliant with existing approvals, "avenues still remain[ed] for the [municipal authority] to clarify or change its decision." BMG Monroe, 93 F.4th at 604. Because plaintiffs failed to avail themselves of these avenues in the form of a variance application to the Town Board, they had "not yet obtained a final decision regarding how [they] will be allowed to develop [their] property." Williamson, 473 U.S. at 190. Accordingly, plaintiffs' land use claims are not ripe for adjudication in federal court.

18

3.    The Futility Exception Does Not Apply

Plaintiffs contend two different exceptions to the final decision requirement apply to their claims. Again, the Court is not persuaded.

To start, the futility exception to the final decision requirement articulated in Murphy v. New Milford Zoning Com'n does not apply to plaintiffs' land use claims. "Courts have interpreted this futility exception narrowly." Missere v. Gross, 826 F. Supp. 2d 542, 555 (S.D.N.Y. 2011). Moreover, the futility exception applies only "when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." Murphy v. New Milford Zoning Com'n, 402 F.3d at 349. Neither situation exists here.

First, the relevant zoning agency—here, the Town Board—retains the authority to grant variances from the existing project approvals. Plaintiffs are correct that, pursuant to the Town Code and state law, the ZBA is authorized to grant a variance. See Forestburgh Town Code § 180-40(A); N.Y. Town L. § 267-b. But the ZBA recognized that, pursuant to the 2011 PDD Approval, only "the Town, as the municipal corporation authorized to establish the [PDD Approval], retains and remains the sole authority to amend any term, restriction and condition of the [PDD Approval]." (Doc. #112-14 at 33–34). Therefore, plaintiffs' arguments that "[t]he Zoning Board lacks discretion to grant variances" and that any variance application for a modification to the project approvals submitted to the ZBA would be "futile" and "impossible" are irrelevant, because the Town Board is vested with this authority. (Doc. #176 at 23). The fact remains that plaintiffs' building permit applications were denied because they were inconsistent with existing project approvals, the Town Board retained the authority to amend any term,

19

restriction, or condition of these approvals, and plaintiffs did not apply to the Town Board for a variance or modification.

Plaintiffs argue there is no possible variance that would "allow housing for a Hasidic Jewish demographic." (Doc. #176 at 23 n.16). Yet even assuming such a variance could be sought and granted, it would not cure the deficiencies identified in the building permit denials, which concluded that the permits did not adhere to the existing project approvals—particularly around density and occupancy restrictions and environmental mitigation measures—obtained by Double Diamond. In any event, the relevant municipal agency—here, the Town Board—retains discretion to grant a variance.[3] Therefore, a variance application submitted to the Town Board would not be futile.

Second, there is no indication the Town Board had "dug in its heels and made clear that all such applications will be denied." Murphy v. New Milford Zoning Com'n, 402 F.3d at 349. Plaintiffs allege a variance application would be futile given defendants' alleged hostility toward their proposal for the Lost Lake property. Yet hostility alone is not sufficient to demonstrate futility. See S&R Dev. Ests., LLC v. Bass, 588 F. Supp. 2d at 463 ("Although [plaintiff] has

---

[3]     Plaintiffs allege that on January 9, 2020, "the Town Board voted to repeal the existing Planned Development District law [Local Law 3 of 2011] in its entirety," and that this repeal divested the Town Board of jurisdiction over variance applications. (Am. Compl. ¶¶ 106, 431; Doc. #176 at 23). Yet plaintiffs' contention constitutes a "naked assertion[] devoid of further factual enhancement" and is "no more than [a] conclusion[]," which is "not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). Indeed, further factual development directly contradicts plaintiffs' assertion. In its November 15, 2022, decision, for example, the ZBA held that the repeal of Local Law 3 of 2011 did not affect the validity of the project approvals and that such approvals were still "subject to the repealed PDD local laws," such that the Town Board "remain[ed] the sole authority to amend any term, restriction and condition" of the 2011 PDD Approval. (Doc. #112-14 at 33–34). Accordingly, as plaintiffs' assertion does not amount to a "well-pleaded factual allegation[]," Ashcroft v. Iqbal, 566 U.S. at 679, the Court declines to accept as true plaintiffs' assertion that the Town Board was divested of jurisdiction over variance applications on January 9, 2020.

20

faced opposition to its development plan from Town officials and influential Town groups, it has not shown that the prospect of refusal from the ZBA would be certain."). Thus, hostility in the form of public comments on articles about Lost Lake or discriminatory remarks made during public hearings does not prove the Town Board would have denied a variance application from plaintiffs.

Similarly, plaintiffs accuse defendants of intentionally misconstruing regulations to prevent plaintiffs from developing Lost Lake. But "allegations of . . . misinterpret[ing] . . . [r]egulations in order to make development [of plaintiffs' property] more difficult . . . are insufficient to show that the prospect of refusal is certain and invoke the narrow futility exception." Goldfine v. Kelly, 80 F. Supp. 2d 153, 161 (S.D.N.Y. 2000). And even when plaintiffs claim defendants are acting in bad faith, courts have declined to invoke the futility exception. Osborne v. Fernandez, 2009 WL 884697, at *6 (S.D.N.Y. Mar. 31, 2009) ("Courts have also declined to invoke the futility exception even where, as here, a plaintiff claimed that the defendant decisionmakers were hostile to plaintiff's proposed development or acting in bad faith.").

Again, BMG Monroe is instructive. There, the Second Circuit rejected plaintiffs' contention that the doubts or unwillingness expressed by some members of the relevant municipal agency necessarily meant the agency would refuse to entertain an application for a variance. BMG Monroe, 93 F.4th at 603. Although the agency "might have expressed doubts about [plaintiffs'] prospects for receiving a variance, mere doubt that a variance application would be granted is insufficient to establish futility." Id. (emphasis in original). In other words, plaintiffs "cannot sidestep" the final decision requirement "merely by asserting that the [municipal agency] did not appear to be receptive to granting [a] variance." Id. at 604.

21

So too here.  As in BMG Monroe, the Town Board did not make clear that any application for a variance or modification would be denied.  There were no procedural hurdles preventing plaintiffs from applying for a variance or preventing the Town Board from granting one.  In fact, in its February 2, 2023, Resolution, the Town Board explicitly invited plaintiffs to "submit[] its proposed changes to the Town Board to undergo additional review under SEQRA, and obtain necessary and appropriate modifications to the terms and conditions of the Project Approvals."  (Doc. #110-17 at 3).  Therefore, it cannot be said that the Town Board, as the authority with the discretion to grant variances, had "dug in its heels and made clear that all such applications will be denied."  Murphy v. New Milford Zoning Com'n, 402 F.3d at 349 (emphasis added).

The Court acknowledges that it previously held the futility exception applied because the parties had "staked out their positions."  (Doc. #123 at 10).  That is, defendants had made clear their intent to demand "strict compliance with the Town's zoning and land-use regulations" and plaintiffs were adamant they had no obligation to comply with the ordered supplemental environmental review process.  (Id.).  But defendants' insistence on plaintiffs' compliance with existing approvals does not mean plaintiffs' variance applications to change those approvals would automatically be denied.  BMG Monroe, 93 F.4th at 603–04; Murphy v. New Milford Zoning Com'n, 402 F.3d at 349.  Therefore, the parties' positions in this case—especially those of the plaintiffs—do not bear on the question of whether the futility exception applies, and are ultimately irrelevant to the question of whether plaintiffs should be excused from failing to comply with the finality requirement.  As such, the Court reconsiders its previous holding on this ground; especially in light of BMG Monroe, it is clear the futility exception does not apply here.

Accordingly, the futility exception to the final decision requirement does not apply.

22

#### 4. The Exception for Discrimination Claims Does Not Apply

Finally, the exception to the final decision requirement for land use claims alleging discriminatory treatment also does not apply to plaintiffs' claims.

A plaintiff alleging discriminatory treatment in the land use context is subject to the final decision requirement "unless he can show that he suffered some injury independent of the challenged land-use decision." Sunrise Detox V, LLC v. City of White Plains, 769 F.3d at 123. For example, "a plaintiff need not await a final decision to challenge a zoning policy that is discriminatory on its face, or the manipulation of a zoning process out of discriminatory animus to avoid a final decision," because an additional administrative decision would not further define the injury. Id.

Plaintiffs' allegations of discriminatory treatment fall well within Williamson and its progeny and are not exempt from the final decision requirement. As the Court has previously determined, plaintiffs assert only as-applied challenges, not facial challenges, to certain resolutions and orders issued by the Town Board. See, e.g., Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 295. Accordingly, plaintiffs' challenges to the Town Board's resolutions and orders are insufficient to give rise to an independent injury.

Moreover, plaintiffs do not allege they have suffered an injury independent of defendants' land use decisions. Plaintiffs allege their rights were violated when defendants' actions on the building permit applications prevented plaintiffs from "building sorely needed homes," caused financial damages including "the loss of home sales," and "completely prohibited [plaintiffs] from taking any further action." (Doc. #176 at 19–20). As such, all of plaintiffs' injuries derive from defendants' allegedly discriminatory efforts to prevent plaintiffs from developing Lost Lake, starting with the building inspector's denial of the building permit applications. Therefore,

23

plaintiffs must first provide the Court with a final, definitive position on the building permit applications.  "Absent that showing, [plaintiffs'] claims cannot be said to have yet matured to a point that warrants decision."  Vill. Green at Sayville, LLC v. Town of Islip, 43 F.4th at 296.

Furthermore, although plaintiffs allege the building permit approval process and ZBA appeal were manipulated out of discriminatory animus, they do not contend defendants engaged in such manipulation to "avoid a final decision" on plaintiffs' building permit applications. Sunrise Detox V, LLC v. City of White Plains, 769 F.3d at 123.  Both the ZBA and the Town Board recognized plaintiffs' ability to seek a variance from the Town Board, and there was no logistical barrier preventing plaintiffs from applying for a variance.  Because the availability of "administrative avenues for relief" precludes the finding of injuries "independent of the [Town Board's] ultimate land-use decision," plaintiffs' allegations of manipulation cannot give rise to an independent injury that is exempt from the final decision requirement.  Id. at 124.

To be sure, the Court is mindful of the sensitive historical and religious context in which this case arises and acknowledges the biased and anti-Semitic statements allegedly made by Sullivan County residents at public hearings and in online forums.  However, as plaintiffs fail to assert the alleged discriminatory treatment resulted in injuries independent of defendants' land use decisions, the exception for discrimination claims simply does not apply.

Accordingly, plaintiffs' allegations of discriminatory treatment as to their land use claims remain subject to the final decision requirement under Williamson.

24

**SPA - 25**

## CONCLUSION

The motion to dismiss is GRANTED.

Plaintiff's land use claims (Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XII, XIII, XIV,

XV, XVI, XIX, XX, XXI, XXII) are dismissed. Plaintiffs' remaining claims (Counts XI, XVII,

XVIII) claims may proceed.

The case management conference scheduled for July 16, 2025, at 10:00 a.m., shall

proceed as scheduled. Counsel shall be prepared to discuss a schedule for the completion of

pretrial discovery, as well as what good faith efforts they have made and will continue to make to

settle this case.

The Clerk is instructed to terminate the motion. (Doc. #162).

Dated: July 9, 2025
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

**SPA - 26**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

LOST LAKE HOLDINGS, LLC, et al.,
                              Plaintiffs,

v.

THE TOWN OF FORESTBURGH, et al.,
                             Defendants.

---------------------------------------------------------------x

**ORDER**

22 CV 10656 (VB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/22/25

     The Court having dismissed Counts I-X, XII-XVI, and XIX-XXII of the Amended Complaint in an Opinion & Order (Doc. #186), and the parties having filed a stipulation and order of voluntary dismissal as to Counts XI, XVII, and XVIII of the Amended Complaint (Doc. #191), the Clerk is instructed to enter Judgment closing this case.

Dated:  August 22, 2025
         White Plains, NY

                           SO ORDERED:

                           _____
                           Vincent L. Briccetti
                           United States District Judge

**SPA - 27**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
LOST LAKE HOLDINGS, LLC, et al.,

                            Plaintiffs,

            -against-                                    22 **CIVIL** 10656 (VB)

                                                        **<u>JUDGMENT</u>**

THE TOWN OF FORESTBURGH, et al.,

                            Defendants.
------------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Order dated August 22, 2025, the Court having dismissed Counts I-X, XII-

XVI, and XIX-XXII of the Amended Complaint in an Opinion & Order (Doc. # 186), and the

parties having filed a stipulation and order of voluntary dismissal as to Counts XI, XVII, and

XVIII of the Amended Complaint (Doc. # 191); accordingly the case is closed.

**Dated:**  New York, New York

          August 22, 2025

                                        **TAMMI M. HELLWIG**
                                   _____
                                          **Clerk of Court**

                        **BY:**
                                   _____
                                          **Deputy Clerk**

**SPA - 28**

**42 U.S.C. § 3602**

(a) "Secretary" means the Secretary of Housing and Urban Development.

(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(c) "Family" includes a single individual.

(d) "Person" includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries.

(e) "To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(f) "Discriminatory housing practice" means an act that is unlawful under section 3604, 3605, 3606, or 3617 of this title.

(g) "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States.

(h) "Handicap" means, with respect to a person--

    (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

    (2) a record of having such an impairment, or

    (3) being regarded as having such an impairment,

but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

(i) "Aggrieved person" includes any person who--

    (1) claims to have been injured by a discriminatory housing practice; or

    (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

(j) "Complainant" means the person (including the Secretary) who files a complaint under section 3610 of this title.

(k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with--

    (1) a parent or another person having legal custody of such individual or individuals; or

    (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

(l) "Conciliation" means the attempted resolution of issues raised by a complaint, or by the investigation of such complaint, through informal negotiations involving the aggrieved person, the respondent, and the Secretary.

(m) "Conciliation agreement" means a written agreement setting forth the resolution of the issues in conciliation.

(n) "Respondent" means--

(1) the person or other entity accused in a complaint of an unfair housing practice; and

(2) any other person or entity identified in the course of investigation and notified as required with respect to respondents so identified under section 3610(a) of this title.

(o) "Prevailing party" has the same meaning as such term has in section 1988 of this title.

**42 U.S.C. § 3604:**

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful--

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

**42 U.S.C. § 3617:**

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

**42 U.S.C. § 1982:**

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

**42 U.S.C. § 1983:**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**New York Civil Rights Law § 40-c:**

1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2. No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

**N.Y. TOWN L. § 267(b):**

1. Orders, requirements, decisions, interpretations, determinations. The board of appeals may reverse or affirm, wholly or partly, or may modify the order, requirement, decision, interpretation or determination appealed from and shall make such order, requirement, decision, interpretation or determination as in its opinion ought to have been made in the matter by the administrative official charged with the enforcement of such ordinance or local law and to that end shall have all the powers of the administrative official from whose order, requirement, decision, interpretation or determination the appeal is taken.

2. Use variances. (a) The board of appeals, on appeal from the decision or determination of the administrative official charged with the enforcement of such ordinance or local law, shall have the power to grant use variances, as defined herein.

(b) No such use variance shall be granted by a board of appeals without a showing by the applicant that applicable zoning regulations and restrictions have caused unnecessary hardship. In order to prove such unnecessary hardship the applicant shall demonstrate to the board of appeals that for each and every permitted use under the zoning regulations for the particular district where the property is located, (1) the applicant cannot realize a reasonable return, provided that lack of return is substantial as demonstrated by competent financial evidence; (2) that the alleged hardship relating to the property in question is unique, and does not apply to a substantial portion of the district or neighborhood; (3) that the requested use variance, if granted, will not alter the essential character of the neighborhood; and (4) that the alleged hardship has not been self-created.

(c) The board of appeals, in the granting of use variances, shall grant the minimum variance that it shall deem necessary and adequate to address the unnecessary hardship proven by the applicant, and at the same time preserve and protect the character of the neighborhood and the health, safety and welfare of the community.

3. Area variances. (a) The zoning board of appeals shall have the power, upon an appeal from a decision or determination of the administrative official charged with the enforcement of such ordinance or local law, to grant area variances as defined herein.

(b) In making its determination, the zoning board of appeals shall take into consideration the benefit to the applicant if the variance is granted, as weighed against the detriment to the health, safety and welfare of the neighborhood or community by such grant. In making such determination the board shall also consider: (1) whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created by the granting of the area variance; (2) whether the benefit sought by the applicant can be achieved by some method, feasible for the applicant to pursue, other than an area variance; (3) whether the requested area variance is substantial; (4) whether the proposed variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood or district; and (5) whether the alleged difficulty was self-created, which consideration shall be relevant to the decision of the board of appeals, but shall not necessarily preclude the granting of the area variance.

(c) The board of appeals, in the granting of area variances, shall grant the minimum variance that it shall deem necessary and adequate and at the same time preserve and protect the character of the neighborhood and the health, safety and welfare of the community.

4. Imposition of conditions. The board of appeals shall, in the granting of both use variances and area variances, have the authority to impose such reasonable conditions and restrictions as are directly related to and incidental to the proposed use of the property. Such conditions shall be consistent with the spirit and intent of the zoning ordinance or local law, and shall be imposed for the purpose of minimizing any adverse impact such variance may have on the neighborhood or community.

**New York Civil Practice Law and Rules Article 78:**

**§ 7801:**

Relief previously obtained by writs of certiorari to review, mandamus or prohibition shall be obtained in a proceeding under this article. Wherever in any statute reference is made to a writ or order of certiorari, mandamus or prohibition, such reference shall, so far as applicable, be deemed to refer to the proceeding authorized by this article. Except where otherwise provided by law, a proceeding under this article shall not be used to challenge a determination:

1. which is not final or can be adequately reviewed by appeal to a court or to some other body or officer or where the body or officer making the determination is expressly authorized by statute to rehear the matter upon the petitioner's application unless the determination to be reviewed was made upon a rehearing, or a rehearing has been denied, or the time within which the petitioner can procure a rehearing has elapsed; or

2. which was made in a civil action or criminal matter unless it is an order summarily punishing a contempt committed in the presence of the court.

### § 7802:

(a) Definition of "body or officer". The expression "body or officer" includes every court, tribunal, board, corporation, officer, or other person, or aggregation of persons, whose action may be affected by a proceeding under this article

(b) Persons whose terms of office have expired; successors. Whenever necessary to accomplish substantial justice, a proceeding under this article may be maintained against an officer exercising judicial or quasi-judicial functions, or member of a body whose term of office has expired. Any party may join the successor of such officer or member of a body or other person having custody of the record of proceedings under review.

(c) Prohibition in favor of another. Where the proceeding is brought to restrain a body or officer from proceeding without or in excess of jurisdiction in favor of another, the latter shall be joined as a party.

(d) Other interested persons. The court may direct that notice of the proceeding be given to any person. It may allow other interested persons to intervene.

### § 7803:

The only questions that may be raised in a proceeding under this article are:

1. whether the body or officer failed to perform a duty enjoined upon it by law; or

2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or

3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or

4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.

5. A proceeding to review the final determination or order of the state review officer pursuant to subdivision three of section forty-four hundred four of the education law shall be brought pursuant to article four of this chapter and such subdivision; provided, however, that the provisions of this article shall not apply to any proceeding commenced on or after the effective date of this subdivision.

### § 7804:

(a) Special proceeding. A proceeding under this article is a special proceeding.

(b) Where proceeding brought. A proceeding under this article shall be brought in the supreme court in the county specified in subdivision (b) of section 506 except as that subdivision otherwise provides.

(c) Time for service of notice of petition and answer. Unless the court grants an order to show cause to be served in lieu of a notice of petition at a time and in a manner specified therein, a notice of petition, together with the petition and affidavits specified in the notice, shall be served on any adverse party at least twenty days before the time at which the petition is noticed to be heard. An answer and supporting affidavits, if any, shall be served at least five days before such time. A reply, together with supporting affidavits, if any, shall be served at least one day before such time. In the case of a proceeding pursuant to this article against a state body or officers, or against members of a state body or officers whose terms have expired as authorized by subdivision (b) of section 7802 of this chapter, commenced either by order to show cause or notice of petition, in addition to the service thereof provided in this section, the order to show cause or notice of petition must be served upon the attorney general by delivery of such order or notice to an assistant attorney general at an office of the attorney general in the county in which venue of the proceeding is designated, or if there is no office of the attorney general within such county, at the office of the attorney general nearest such county. In the case of a proceeding pursuant to this article against members of bodies of governmental subdivisions whose terms have expired as authorized by subdivision (b) of section 7802 of this chapter, the order to show cause or notice of petition must be served upon such governmental subdivision in accordance with section 311 of this chapter.

(d) Pleadings. There shall be a verified petition, which may be accompanied by affidavits or other written proof. Where there is an adverse party there shall be a verified answer, which must state pertinent and material facts showing the grounds of the respondent's action complained of. There shall be a reply to a counterclaim denominated as such and there shall be a reply to new matter in the answer or where the accuracy of proceedings annexed to the answer is disputed. The court may permit such other pleadings as are authorized in an action upon such terms as it may specify.

(e) Answering affidavits; record to be filed; default. The body or officer shall file with the answer a certified transcript of the record of the proceedings under consideration, unless such a transcript has already been filed with the clerk of the court. The respondent shall also serve and submit with the answer affidavits or other written proof showing such evidentiary facts as shall entitle him to a trial of any issue of fact. The court may order the body or officer to supply any defect or omission in the answer, transcript or an answering affidavit. Statements made in the answer, transcript or an answering affidavit are not conclusive upon the petitioner. Should the body or officer fail either to file and serve an answer or to move to dismiss, the court may either issue a judgment in favor of the petitioner or order that an answer be submitted.

(f) Objections in point of law. The respondent may raise an objection in point of law by setting it forth in his answer or by a motion to dismiss the petition, made upon notice within the time allowed for answer. If the motion is denied, the court shall permit the respondent to answer, upon such terms as may be just; and unless the order specifies otherwise, such answer shall be served and filed within five days after service of the order with notice of entry; and the petitioner may re-notice the matter for hearing upon two days' notice, or the respondent may re-notice the matter for hearing upon service of the answer upon seven days' notice. The petitioner may raise an objection in point of law to new matter contained in the answer by setting it forth in his reply or by moving to strike such matter on the day the petition is noticed or re-noticed to be heard.

(g) Hearing and determination; transfer to appellate division. Where the substantial evidence issue specified in question four of section 7803 is not raised, the court in which the proceeding is commenced shall itself dispose of the issues in the proceeding. Where such an issue is raised, the court shall first dispose of such other objections as could terminate the proceeding, including but not limited to lack of jurisdiction, statute of limitations and res judicata, without reaching the

substantial evidence issue. If the determination of the other objections does not terminate the proceeding, the court shall make an order directing that it be transferred for disposition to a term of the appellate division held within the judicial department embracing the county in which the proceeding was commenced. When the proceeding comes before it, whether by appeal or transfer, the appellate division shall dispose of all issues in the proceeding, or, if the papers are insufficient, it may remit the proceeding.

(h) Trial. If a triable issue of fact is raised in a proceeding under this article, it shall be tried forthwith. Where the proceeding was transferred to the appellate division, the issue of fact shall be tried by a referee or by a justice of the supreme court and the verdict, report or decision rendered after the trial shall be returned to, and the order thereon made by, the appellate division.

(i) Appearance by judicial officer. Notwithstanding any other provision of law, where a proceeding is brought under this article against a justice, judge, referee or judicial hearing officer appointed by a court and (1) it is brought by a party to a pending action or proceeding, and (2) it is based upon an act or acts performed by the respondent in that pending action or proceeding either granting or denying relief sought by a party thereto, and (3) the respondent is not a named party to the pending action or proceeding, in addition to service on the respondent, the petitioner shall serve a copy of the petition together with copies of all moving papers upon all other parties to the pending action or proceeding. All such parties shall be designated as respondents. Unless ordered by the court upon application of a party the respondent justice, judge, referee or judicial hearing officer need not appear in the proceeding in which case the allegations of the petition shall not be deemed admitted or denied by him. Upon election of the justice, judge, referee or judicial hearing officer not to appear, any ruling, order or judgment of the court in such proceeding shall bind said respondent. If such respondent does appear he shall respond to the petition and shall be entitled to be represented by the attorney general. If such respondent does not elect to appear all other parties shall be given notice thereof.

## § 7805:

On the motion of any party or on its own initiative, the court may stay further proceedings, or the enforcement of any determination under review, upon terms including notice, security and payment of costs, except that the enforcement of an order or judgment granted by the appellate division in a proceeding under this article may be stayed only by order of the appellate division or the court of appeals. Unless otherwise ordered, security given on a stay is effective in favor of a person subsequently joined as a party under § 7802

## § 7806:

The judgment may grant the petitioner the relief to which he is entitled, or may dismiss the proceeding either on the merits or with leave to renew. If the proceeding was brought to review a determination, the judgment may annul or confirm the determination in whole or in part, or modify it, and may direct or prohibit specified action by the respondent. Any restitution or damages granted to the petitioner must be incidental to the primary relief sought by the petitioner, and must be such as he might otherwise recover on the same set of facts in a separate action or proceeding suable in the supreme court against the same body or officer in its or his official capacity.

**TOWN OF FORESTBURGH CODE § 180-38**:

The ZBA shall have the powers and duties authorized by the New York State Town Law and shall have the following additional powers and duties, provided that none of the following provisions shall be deemed to limit any power of the ZBA that is conferred by law:

A. The ZBA shall, upon request from or appeal of a decision by the Code Enforcement Officer or any administrative body of the Town of Forestburgh, including the Town Board, decide any question involving the interpretation of any provision of this chapter, including determination of the exact location of any district boundary if there is uncertainty with respect thereto.

**TOWN OF FORESTBURGH CODE § 180-40**:

A. No existing violations. No use variance shall be issued, and no application for a use variance shall be considered by the ZBA, for a property where there is an existing violation of this chapter or the Property Maintenance Code upon such property. Other than an existing violation which is the subject of the area variance application being considered, no area variance shall be issued, and no application for an area variance shall be considered by the ZBA for a property where there is an existing violation of this chapter or the property maintenance code upon such property or other Forestburgh property owned by the applicant.

B. Public notice shall be in accordance with § 180-39D.

C. Failure to complete construction. Any area variance or use variance granted pursuant to this chapter shall automatically expire and be of no further force and effect 12 months after the granting thereof unless, within such twelve-month period, construction is substantially complete. The ZBA shall be authorized, upon application and without hearing, to grant extensions of the variance for periods not to exceed six months in duration or to reinstate a lapsed variance for good cause shown.

**Local Law No. 4 of 2018:**

"A Local Law Imposing a Temporary Town wide Moratorium on the Processing of Applications For, and the Issuance of Any Approvals or Permits For Major Subdivisions in the Town of Forestburgh."

**Local Law No. 1 of 2020**:

Section 1. Title and Applicability:

This Local Law shall be referred to as the Repeal of the Planned Development District Laws of 2008, 2011 & 2017. Such Repeal shall have no effect on approvals previously granted with respect to any existing Planned Development Districts.

Section 2. Amendment of Chapter 85 of the Town of Forestburgh Code:

Article V of Chapter 85 (Subsections 85-17 through 85-21 inclusive) of the Town of Forestburgh Town Code ("Zoning") is hereby repealed. To the extent that any repealer of said law would serve

to reinstate the Planned Unit Development Law adopted by the by the Town of Forestburgh in the 1970's said Planned Unit Development Law is also hereby repealed, as that is not the intention of the Town Board.

Section 3. Severability

If any part or provision of this Local Law or the application thereof to any person or circumstance be adjudged invalid by any court of competent jurisdiction, such judgment shall be confined in its operation to the part or provision or application directly involved in the controversy in which such judgment shall have been rendered and shall not affect or impair the validity of the remainder of this Local Law or the application thereof to other persons or circumstances, and the Town Board of the Town of Forestburgh hereby declares that it would have passed this Local Law or the remainder thereof had such invalid application or invalid provision been apparent.

Section 4. Repeal

All ordinances, local laws and parts thereof inconsistent with this Local Law are hereby repealed.

Section 5. Effective Date

This Local Law shall take effect immediately upon filing in the office of the New York State Secretary of State in accordance with Section 27 of the Municipal Home Rule Law and will apply to all new applications submitted on or after that date.

**Local Law No. 1 of 2022:**

SECTION 1. PURPOSE AND INTENT.

This local law is intended to temporarily prohibit accepting, reviewing, and approving building and land use approval applications requiring escrows within the Town of Forestburgh for a period of up to three months from the effective date herein. The purpose of this moratorium is to provide the Town adequate time to review and, if necessary, amend applicable Town Code provisions in order to assure compliance with requirements related to establishment of project escrows and payment of consultant fees/ expenses incurred by the Town undertaking review of such applications. During the term of the moratorium, the Town of Forestburgh shall work to review and/or adopt amendments to the Town Code to provide for the benefit, health, and general welfare of the residents of the Town of Forestburgh. Moratoria are useful in controlling or temporarily inhibiting development until satisfactory final regulations are adopted.

For these reasons, the Town Board finds that temporary moratorium legislation is both advisable and necessary for a reasonable and defined period of time in order to further develop and adopt necessary zoning and land use changes to the Forestburgh Town Code, thus protecting and furthering the public interest, health, and safety.

SECTION 2. TEMPORARY MORATORIUM.

A. There is hereby adopted in the Town of Forestburgh a three-month moratorium on the consideration, receipt, review, or granting of building permits, land use applications, site plan

approval, and zoning changes or amendments to permits that require establishment of an escrow to pay for outside consultants.

 B.      During the term of the moratorium the Town Board intends to review Town Code provisions related to project escrows for consistency with applicable law and if necessary, develop, consider, and adopt changes to the Town Code to regulate the same. Said moratorium shall be effective as of the date set forth below.

 C.      While the moratorium is in effect, no applications shall be accepted, and no permits issued or approvals given by any department, board, agency or official of the Town of Forestburgh for any permit or approval that requires establishment of an escrow.

SECTION 3. APPLICABILITY.
The provisions of this local law shall apply to all real property within the Town of Forestburgh.

SECTION 4. RELIEF FROM APPLICABILITY OF MORATORIUM.
Applications for land use otherwise subject to this moratorium may be exempted from the provisions of this local law following a noticed public hearing before the Town Board, at which hearing the Town Board shall consider:

1. Hardship on the applicant.
2. Compatibility of the proposed application with the recommendations of any administrative body charged with such review by the Town of Forestburgh.
5. The written opinion of the Town of Forestburgh Planning Board and the Town of Forestburgh Code Enforcement Officer that such application may be jeopardized or made impractical by waiting until the moratorium is expired.
6. Such other reasonable considerations and issues as may be raised by the Town Board. An application for relief from the moratorium shall be accompanied by a fee of $500, together with the applicant's written justification for why it is entitled to a variance from the moratorium.

An application for relief from the moratorium shall be accompanied by a fee of $500, together with the applicant's written justification for why it is entitled to a variance from the moratorium.

In deciding concerning a proposed exemption or grant of relief from the moratorium, the Town Board may obtain and consider reports and information from any source it deems to be consistent with
review of said application. A grant of relief from application of the moratorium shall include a determination of unreasonable hardship upon the property owner which is unique to the property owner,
and a finding that the grant of an exemption will be in harmony with and will be consistent with all applicable laws.

**SPA - 38**

SECTION 5. STATUTORY AUTHORITY; SUPERCESSION.

This local law is promulgated and adopted pursuant to Municipal Home Rule Law and the State Environmental Quality Review Act, and its implementing regulations. It expressly supersedes any provisions of the Town Code of the Town of Forestburgh, and sections 267, 267-a, 267-b, 267-c, 274-a, 274-b and 276 of the Town Law of the State of New York. This local law shall supersede and suspend those provisions of the Town Code and New York state law which require the Planning Board and the Town Code Enforcement officer to accept, process, and approve land use applications within certain statutory time periods.

SECTION 6. SEQRA DETERMINATION

The Town Board hereby determines that the adoption of this local law is a Type II action under 6 NYC RR 617 .5( c )(36) and that environmental review under the NYS Environmental Quality Review Act (SEQRA) is not required.

SECTION 7. CONFLICTS.

For and during the stated term of this legislation, unless the stated term thereof shall be modified or abridged by _the Town Board, this moratorium shall take precedence over and shall control over any contradictory local law, ordinance, regulation or Code provision.

SECTION 8. SEVERABILITY
The ir1validity of any word, section, clause, sentence, paragraph, part or provision of this local law shall not affect the validity of any other part of the law which can be given effect without such invalid part or parts.

SECTION 9. EFFECTIVE DATE

The effective date of this local law shall be immediate upon its filing with the Secretary of State, or upon actual submission of a copy of the adopted local law to any individual, person or applicant.

**<u>Resolution 2023-02:</u>**

Requiring Supplemental Environmental Review and Authorizing Legal Action Against the Owners of the Lost Lake Resort Property Located on Cold Spring Road, Town of Forestburgh

At a meeting of the Town Board of the Town of Forestburgh, Sullivan County, New York, held at the Town Hall, 332 King Road, Forestburgh, N.Y., on the 2nd day of February, 2023:

Councilperson Ellsweig offered the following resolution and moved for its adoption:

WHEREAS, in September of 2008 , Double Diamond Inc. (" Double Diamond") proposed to develop a planned resort and residential community on approximately 2,100 acres located in the Town known as the Lost Lake Resort ("Resort Project");

WHEREAS , Double Diamond proposed to construct a resort development consisting of a gated community of over 2,600 building lots, an 18-hole championship golf course, a clubhouse, hotel, restaurant, conference center, spa, swimming facilities, tennis facilities, wilderness trails, and other resort amenities;

WHEREAS, the Resort Project application was subject to review under the State Environmental Quality Review Act ("SEQRA"), including the preparation of a Draft Environmental Impact Statement ("DEIS ") , a Final Environmental Impact Statement (" FEIS"), and a SEQRA Findings Statement;

WHEREAS, the Town Board's review under SEQ RA was based on the resort development proposed by Double Diamond, including representations made by Double Diamond that the project was intended for primarily a second-home and non-resident population for weekend and vacation use and that the developer would not build single-family homes but rather sell vacant lots to individuals ;

WHEREAS , the SEQRA Findings Statement for the Resort Project included enforceable terms, restrictions, and mitigation measures specifically tailored to mitigate or avoid impacts arising from the Resort Project as proposed by Double Diamond;

WHEREAS, after completing environmental review under SEQRA and adopting the Finding Statement, the Town Board granted PDD approval to the Resort Project by resolution dated August 4, 2011 ("2011 PDD Approval "), and granted conditional final site plan and\subdivision approval for the first of seven project phases by resolution on June 25 , 2013 ("2013 Conditional Final Approval " );

WHEREAS , the 2011 PDD Approval and 2013 Conditional Final Approval were expressly conditioned on compliance with the specific mitigation measures considered in the DEIS / FEIS, and incorporated into the SEQRA Findings Statement;

WHEREAS, in June of 2020, Double Diamond sold the Project to Lost Lake Holdings, LLC and Mishconos Mazah, LLC ( collectively "Developer") without having completed the infrastructure improvements;

WHEREAS, Developer sought and was initially issued building permits for Resort Project Lots 301 and 302 but the Lot 302 permit was later revoked;

WHEREAS, in June of 2021, Developer applied for a building permit to construct a single family residential dwelling on Resort Project Lot 303;

WHEREAS, on November 23, 2021, the Building Inspector denied Developer's Lot 303 building permit application on the basis that Developer ' s intended housing development was inconsistent with the Resort Project approval conditions , terms and restrictions;

WHEREAS, Developer appealed the Building Inspector's decision to the Town Zoning Board of Appeals ("ZBA");

WHEREAS, Developer's appeal was subject to a formal evidentiary hearing and included six days of witness direct and cross-examination testimony at which the ZBA developed an extensive record;

WHEREAS, by decision dated November 15, 2022 , the ZBA issued a comprehensive 36-page ruling affirming the Building Inspector's denial and finding that Developer's intent to construct and sell housing units based on Developer's own design specifications is inconsistent with and materially different from the Resort Project approval conditions, terms and restrictions that authorized Double Diamond to sell vacant lots to individual owners who would build single family homes in accordance with the design specifications and requirements approved by the Town and incorporated into the SEQRA Findings Statement;

WHEREAS, the PDD Local Law requires that project approvals and its conditions, terms and restrictions may not be modified or amended without reassessment of impacts under SEQRA and Town Board approval;

WHEREAS , despite the ZBA Ruling , Developer continued with construction activities on the Lost Lake Resort Property;

WHEREAS, on January 1, 2023, the Building Inspector issued a stop work order requiring Developer to cease construction on Lot 301;

WHEREAS, on February 1, 2023 , the Building Inspector issued a stop work order and notice of violation related to Developer ' s continued infrastructure construction activities;

WHEREAS, the Town is authorized under New York State Town Law to maintain an action or proceeding in the name of the Town to enforce its local laws and zoning regulations.

NOW THEREFORE BE IT RESOLVED that the Town Board finds that Developer's changes and modifications to the Resort Project as fully detailed in the ZBA's November 15, 2022 Decision constitutes "changes in the project" or "a change in the circumstance" as those terms are used in 6 NYCRR $ 617.9 (a) (7) and therefore Developer will be required to prepare a supplemental environmental impact statement and obtain approvals for such modifications as required under PDD Local Law § 85-19 (B) (2), and other applicable law or regulation;

BE IT FURTHER RESOLVED that all Town issued permits and approvals, including the Resort Project's 2011 PDD Approval and 2013 Conditional Final Approval are hereby suspended and any construction or land disturbance activities permitted thereunder are no longer authorized unless and until Developer submits its proposed changes to the Town Board to undergo additional review

under SEQRA, and obtain necessary and appropriate modifications to the terms and conditions of the Project Approvals;

BE IT FURTHER RESOLVED that the Town Clerk shall provide notice and a copy of this Resolution to all interested and involved parties identified in the Resort Project DEIS and shall make the Resolution accessible on the Town's website;

BE IT FURTHER RESOLVED that Harris Beach, PLLC, as Special Counsel for the Town of Forestburgh, is authorized to institute legal action or proceeding in the name of the Town of Forestburgh and the Town Board against the owners of the Lost Lake Resort Property and/or any related party, in Supreme Court of the State of New York to compel compliance with or to restrain by injunction the violation of any applicable Town Code, local law, ordinance, rule or regulation; and to prevent, restrain, correct or abate such violation; and to prevent any illegal act, conduct, business or use in or about such the Property.

BE IT FURTHER RESOLVED that Special Counsel is hereby vested with the discretion to seek monetary and/or punitive damages, injunctive relief, including restraint or specific performance, and/or permanent, preliminary or temporary injunctive relief.

**Federal Rule of Civil Procedure Rule 12(b):**

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19 .

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

**Federal Rule of Civil Procedure Rule 12(c):**

After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.


**United States Constitution Article III Section 2:**

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.


**First Amendment to the United States Constitution:**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.


**Fifth Amendment to the United States Constitution:**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.


**Fourteenth Amendment to the United States Constitution:**

Section 1: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**New York State Constitution Article I § 3:**

The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind; and no person shall be rendered incompetent to be a witness on account of his or her opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.

**New York State Constitution Article I § 5:**

Excessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishments be inflicted, nor shall witnesses be unreasonably detained.

**New York State Constitution Article I § 6:**

No person shall be held to answer for a capital or otherwise infamous crime (except in cases of impeachment, and in cases of militia when in actual service, and the land, air and naval forces in time of war, or which this state may keep with the consent of congress in time of peace, and in cases of petit larceny under the regulation of the legislature), unless on indictment of a grand jury, except that a person held for the action of a grand jury upon a charge for such an offense, other than one punishable by death or life imprisonment, with the consent of the district attorney, may waive indictment by a grand jury and consent to be prosecuted on an information filed by the district attorney; such waiver shall be evidenced by written instrument signed by the defendant in open court in the presence of his or her counsel. In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him or her. No person shall be subject to be twice put in jeopardy for the same offense; nor shall he or she be compelled in any criminal case to be a witness against himself or herself, providing, that any public officer who, upon being called before a grand jury to testify concerning the conduct of his or her present office or of any public office held by him or her within five years prior to such grand jury call to testify, or the performance of his or her official duties in any such present or prior offices, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years from the date of such refusal to sign a waiver of immunity against subsequent prosecution, or to answer any relevant question concerning such matters before such grand jury, and shall be removed from his or her present office by the appropriate authority or shall forfeit his or her present office at the suit of the attorney-general.

The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law. No person shall be deprived of life, liberty or property without due process of law.

**New York State Constitution Article I § 7:**

a) Private property shall not be taken for public use without just compensation.

c) Private roads may be opened in the manner to be prescribed by law; but in every case the necessity of the road and the amount of all damage to be sustained by the opening thereof shall be first determined by a jury of freeholders, and such amount, together with the expenses of the proceedings, shall be paid by the person to be benefitted.

d) The use of property for the drainage of swamp or agricultural lands is declared to be a public use, and general laws may be passed permitting the owners or occupants of swamp or agricultural lands to construct and maintain for the drainage thereof, necessary drains, ditches and dykes upon the lands of others, under proper restrictions, on making just compensation, and such compensation together with the cost of such drainage may be assessed, wholly or partly, against any property benefitted thereby; but no special laws shall be enacted for such purposes.

**New York State Constitution Article I § 9:**

1. No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof; nor shall any divorce be granted otherwise than by due judicial proceedings; except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, and except pari-mutual betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section.

2. Notwithstanding the foregoing provisions of this section, any city, town or village within the state may by an approving vote of the majority of the qualified electors in such municipality voting on a proposition therefor submitted at a general or special election authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previously selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance. If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the legislature: (1) only bona fide religious, charitable or non-profit organizations of veterans, volunteer firefighter and similar non-profit organizations shall be permitted to conduct such games; (2) the entire net proceeds of any game shall be exclusively devoted to the lawful purposes of such organizations; (3) no person except a bona fide member of any such organization shall participate in the management or operation of such game; and (4) no person shall receive any remuneration for participating in the management or operation of any such game. Unless otherwise provided by law, no single prize shall exceed two hundred fifty dollars, nor shall any series of prizes on one occasion aggregate more than one thousand dollars.

The legislature shall pass appropriate laws to effectuate the purposes of this subdivision, ensure that such games are rigidly regulated to prevent commercialized gambling, prevent participation by criminal and other undesirable elements and the diversion of funds from the purposes authorized hereunder and establish a method by which a municipality which has authorized such games may rescind or revoke such authorization. Unless permitted by the legislature, no municipality shall have the power to pass local laws or ordinances relating to such games. Nothing in this section shall prevent the legislature from passing laws more restrictive than any of the provisions of this section.

**New York State Constitution Article I § 11:**

No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.